471 So.2d 375 (1985)
Dr. James T. TRAPP and Radiology of Tupelo, P.A.
v.
John CAYSON.
John CAYSON.
v.
NORTH MISSISSIPPI MEDICAL CENTER.
No. 54476.
Supreme Court of Mississippi.
May 22, 1985.
Rehearing Denied July 10, 1985.
*376 W.P. Mitchell, Stephen M. Corban, Mitchell, Eskridge, Voge, Clayton & Beasley, Tupelo, for Trapp and Radiology.
Jimmy D. Shelton, Roy O. Parker, Tupelo, for Cayson.
Fred M. Bush, Jr., W. Scott Collins, Mitchell, McNutt, Bush, Lagrone & Sams, Tupelo, for North Miss.
En Banc.
ROY NOBLE LEE, Presiding Justice, for the Court:
This medical malpractice case was filed by John Cayson in the Circuit Court of Lee County, Mississippi, against Dr. James T. Trapp, Radiology of Tupelo, P.A. and North Mississippi Medical Center (NMMC). The lower court directed a verdict in favor of North Mississippi Medical Center at the conclusion of Cayson's case and submitted the issues of liability and damages as to Dr. James T. Trapp and Radiology of Tupelo, P.A., to the jury, which returned a verdict of two million dollars ($2,000,000) in favor of Cayson. Dr. Trapp and Radiology of Tupelo, P.A., have appealed, assigning six (6) errors in the trial below. Cayson has appealed from the directed verdict in favor of North Mississippi Medical Center and assigns two (2) errors in the trial.

Facts
John Cayson was seen by his regular doctor, Dr. William Gary, a general practitioner, on December 5, 1977. He complained of headaches, dizziness, and ringing in the ears. Upon Dr. Gary's suggestion, he entered the North Miss. Medical Center (NMMC) the same day for tests. At that time, either an intracranial lesion, obesity, or an anxiety reaction were felt to be the possible causes of his problem. A series of tests all proved normal. After a consultation with the neurosurgeon, an arteriogram was suggested. A CAT scan was not considered.[1] *377 While the arteriogram was being performed, Cayson's problems began.
An arteriogram is conducted by inserting a catheter into the femoral artery. The catheter is then manipulated through the circulatory system until it reaches the neck area. Dr. Trapp, a radiologist with Radiology of Tupelo, P.A., entered the case for the purpose of conducting the arteriogram. During the procedure, he intended to perform a vertebral arteriogram, although the consent papers Mr. Cayson signed were for a bilateral carotid arteriogram. The vertebral arteriogram gives a picture of three arteries (vertebral and both carotid) while the bilateral carotid arteriogram shows only the two carotid arteries. In performing the test, a dye is injected into the arteries and then they are X-rayed.
An arteriogram is considered a simple procedure, and is relatively painless. The arteriogram was performed on December 12, 1977. A left carotid arteriogram was successfully conducted, and a left vertebral arteriogram was being performed when complications arose. Dr. Trapp injected about 1/2 cc. of the dye as a test, which revealed that he was near the thyrocervical artery. Cayson experienced some momentary chest pains, but they subsided. This pain was not unusual. Dr. Trapp then repositioned the catheter near the vertebral artery and again injected a small amount (approximately 1/2 cc.) of the dye. At this point Cayson began experiencing severe pain.
The pain began in Cayson's chest and radiated into his left shoulder and arm. There was also some weakness of the left leg. Cayson was being monitored closely. There was no change in his electrocardiagram or blood pressure, but his pulse rate increased to 110 before returning to 60-70 beats per minute. At this time, the arteriogram was discontinued and Dr. Gary was notified. It was felt that Cayson had suffered a heart attack. During the next few hours in intensive care, a progressive weakness of the arms and legs was noticed. There was also a loss of bladder and bowel control and the loss of feeling below the neck. Dr. Trapp, Dr. Gary and Dr. Thomas Joseph McDonald (a neurosurgeon) consulted with each other and a number of possibilities were discussed.
Dr. Hugh James Francis Robertson, a witness for appellee, testified that Cayson's problems were the result of a reaction to the dye when it entered Cayson's spinal cord. He also explained how this could happen. It was known at the time that paralysis was a possible side effect of the arteriogram, although it is very rare. Dr. Robertson felt that a sufficient amount of dye to cause the problem could have occurred in one of two ways. Dr. Trapp could have injected more than 1/2 cc. of dye as a test and then tried to cover it up, or he could have injected the dye into an artery which directly supplies the spinal cord. Although unusual, some people do have such an artery in the vicinity of the carotid and vertebral arteries. Although Dr. Trapp was not aware of it, Cayson had experienced problems with other tests using the same dye. Dr. Robertson felt this was significant, while Dr. Trapp's witnesses did not.
A number of possibilities were advanced as the cause of Cayson's problems. In order to alleviate his condition, a spinal fluid exchange was considered, but ruled out because it would put a strain on Cayson's heart. Dr. Robertson stated that, had a spinal fluid exchange been done, Cayson probably would not be paralyzed. Dr. Robertson admitted that Cayson was having some symptoms of a heart attack, but felt that a reaction to the dye was more clearly indicated. He was of the opinion this caused Cayson's paralysis.
The defense witnesses were not sure what caused Cayson's problems, but were positive that they were not a reaction to the dye. Two possibilities were complications from suffering a mild heart attack *378 during the arteriogram or a clot in an artery to the spinal cord caused by an arterial spasm. Another possibility mentioned was that one of these conditions could have caused a sudden worsening of an existing problem. At the time these tests were being run, it was suspected that Cayson had a circulatory problem. Dr. Robertson suggested that the ringing of the ears was a result of Cayson's contact with heavy equipment on his job as a construction worker. The defense witnesses said it was just a coincidence that the headaches stopped when Cayson was treated for allergies.[2]
Dr. Robertson further testified that, before an arteriogram was done, several other tests should have been conducted. First, a CAT scan should have been performed. It is considered a non-invasive procedure while an arteriogram is an invasive procedure. He felt that a CAT scan was proper even though it would have required a trip to Memphis. (NMMC did not have the necessary equipment for a CAT scan). If the CAT scan did not show anything unusual, then Dr. Robertson said that a posterior fossa myelogram should have been done. Only then should an arteriogram have been performed. Dr. Robertson testified that an ear, nose and throat specialist should have been consulted due to the ringing in the ears. He based this on the fact that while no specific diagnosis had been made, an acoustic neuroma (tumor in the inner ear) had been suggested. Dr. Trapp's experts testified that a CAT scan would not have been useful and that the possibility of an acoustic neuroma had been eliminated by the earlier tests. There was no explanation why an ear, nose and throat specialist had not been consulted. Dr. Robertson testified that this was a deviation from acceptable medical practice in the area. He also testified as to what should have been done when Cayson started having problems during the arteriogram.
In addition to finding fault with Dr. Trapp's treatment, Dr. Robertson criticized the manner in which Cayson's consent for the procedure was obtained. Dr. Gary ordered, and Cayson signed a consent form for, a bilateral carotid arteriogram. His signature was obtained by two nurses, Charlene Tomlin and Jean Herring, at the Belle Vista unit of the NMMC. They did not explain the procedure to him and did not know whether it had been explained to him when he signed it. Dr. Robertson testified that the nurses should not have signed it, if they did not know whether the procedure had been explained. Defense witnesses testified that the purpose of the nurses' signatures was just to verify Cayson signed the consent. There was no denial that Cayson signed it two days before the procedure was explained to him.
Prior to the arteriogram, Cayson was given 10 mg. of Valium and some aspirin. Dr. Trapp explained the procedure to him shortly before it began. All agree that the explanation should take place before the patient is sedated.
Dr. Robertson testified that the 10 mg. of Valium could have been enough to affect Cayson's ability to understand the procedure. He also stated that Cayson should have been informed about the possibility of paralysis and that it was wrong to put bilateral carotid arteriogram on the consent form when the doctor planned to do a vertebral arteriogram.
Dr. Trapp and his experts testified that it was common practice to have the forms signed before the actual explanation and that the Valium was not enough to affect Cayson. Dr. Trapp said that he observed Cayson and felt Cayson understood the procedure. He stated the term "bilateral carotid arteriogram" was used to note the minimum amount of testing to be done, and that he had the authority to expand the test, if he thought it would be helpful. Thus, the reason he did the vertebral arteriogram. He and his experts testified that *379 they did not feel a specific warning about paralysis was necessary.
Cayson testified he did not remember Dr. Trapp explaining the procedure and that he would not have consented to it had he known about the possibility of paralysis. Cayson's rehabilitation specialist, Dr. Terry Carle, testified that among other things, Cayson suffered from long-term memory loss. Appellants say this is why Cayson does not remember the explanation.
At the time the arteriogram was performed on Cayson, December 12, 1977, he was forty-seven (47) years of age, married, and a construction worker. He has been paralyzed from the chest down since that time and is a quadraplegic.

Law

I.

THE COURT ERRED IN ALLOWING THE TESTIMONY OF DR. ROBERTSON.
The appellants contend that Dr. Robertson was not qualified to testify under the locality rule, and under the expanded rule announced in King v. Murphy, 424 So.2d 547 (Miss. 1983), and was not qualified to testify as to the standard of informed consent in Mississippi. The lower court held that Dr. Robertson was properly qualified in all respects as an expert medical witness for the purpose of testifying in Cayson's behalf.
Voir dire examination of Dr. Robertson was conducted outside the presence of the jury to determine his qualifications as an expert medical witness. Although he has not been licensed to practice medicine in Mississippi, he is licensed in Louisiana, Florida and several other states, where he has practiced as a specialist in diagnostic radiology and sub-specialist in neuroradiology. He graduated from the University of Ottawa, Ottawa, Ontario, Canada, in June, 1959, which institution is accredited and inspected by the American Medical Association and the Canadian Medical Association, and he served his internship at a number of hospitals. In 1968, after passing the examination, he obtained a diploma of the American Board of Radiology in Diagnostic Radiology. Subsequently, he took and passed the oral part of the examination, and became accredited as a specialist in Diagnostic Radiology, recognized by the American Board of Radiology. He has had special training for his sub-speciality of neuroradiology with post-graduate fellowship training at Johns Hopkins Hospital in Baltimore, Maryland, and cardiovascular training at Shady Side Hospital in Pittsburg, Pennsylvania. Dr. Robertson is a senior member of the American Society of Neuroradiology. His training exceeded the requirements of the American Society of Neuroradiology. He is employed by Louisiana State University in New Orleans, where he has been Associate Professor of Radiology for the past four (4) years. Dr. Robertson is head of the section of neuroradiology at Louisiana State University and practices fulltime in the Department of Radiology in the section of neuroradiology at the Charity Hospital, New Orleans. He has published seven (7) articles in radiologic literature and has presented papers at local, national and international meetings.
Every physician in the United States is required to take the same test to become a Diplomate of the American Board of Radiology. Hospitals and all universities require certification by the American Board of Radiology in order that a doctor may be acceptable for employment. Dr. Robertson testified that he had been associated with university hospitals and training programs in radiology for the past thirteen (13) years and that the requirements are the same whether one is practicing in Tupelo, Mississippi, or New Orleans, Louisiana. They set a certain basic standard that is acceptable for practice. Suffice it to say, the record reflects that Dr. Robertson is eminently qualified as a medical expert and as a physician and a specialist in diagnostic radiology and a sub-specialist in neuroradiology.
Although Dr. Robertson admitted that he had never been to Tupelo and had not been in North Mississippi Medical Center until he went to Tupelo for the purpose of testifying in the trial, he stated that from his *380 experience and training, knowledge of standards of practice of radiologists in general, and from reading the deposition of Dr. Trapp and examining the medical records in the case, he is familiar with, and knows, what the care and practice should be, and is, in Tupelo, Mississippi. Further, as to the standard with reference to informed consent, he knew what the standard should be in Tupelo. According to Dr. Robertson, the standard to which he referred is the basic standard set by the examination of the American Board of Radiology and that standard applies to anyone who has passed the examination and practices in this country. It establishes a norm or minimum standard.
In King v. Murphy, 424 So.2d 547 (Miss. 1983), the Court announced the standard of care as an expanded locality rule and held as follows:
[W]e hold that the standard of care by which the acts or omissions of physicians, surgeons or specialists are to be judged shall be that degree of care, skill and diligence practiced by a reasonably careful, skillful, diligent and prudent practitioner in such field of practice or speciality in this state, and for a reasonable distance adjacent to state boundaries. An expert witness who is knowledgeable of, and familiar with, the state-wide standard of care shall not have his testimony excluded on the ground that he does not practice in this state.
424 So.2d at 550.
In the recent case of Hall v. Hilbun, 466 So.2d 856 (Miss. 1985), in a majority opinion, the Court expanded the rule established in King v. Murphy. Actually, the law of Mississippi in malpractice cases, as now stated, is based upon a national standard of care. The question relating to competency of a physician's testimony is to be treated the same as any other expert.
We are of the opinion that, under King v. Murphy and/or Hall v. Hilbun, the lower court correctly held that Dr. Robertson was qualified as an expert in the field of radiology and that the lower court did not commit error in permitting his testimony to be submitted to the jury. The doctor's credibility is for the jury.

II.

THE COURT ERRED IN REFUSING TO DIRECT A VERDICT FOR THE APPELLANTS.
Appellant's argument under this assignment of error presupposes that the Court held that Dr. Robertson was not qualified to testify as an expert and that his testimony has been excluded. Appellants correctly state the rule that negligence on the part of a physician can only be established by expert medical testimony unless the matter in issue is within the common knowledge of laymen and cites Dazet v. Bass, 254 So.2d 183 (Miss. 1971); Copeland v. Robertson, 236 Miss. 95, 112 So.2d 236 (1959); and Sanders v. Smith, 200 Miss. 551, 27 So.2d 889 (1946).
However, since we have held in the foregoing discussion under Assignment I that Dr. Robertson properly qualified as an expert and that his testimony was admissible, the lower court was correct in declining to instruct the jury to return a verdict for the appellants.

III.

THE LOWER COURT ERRED IN ALLOWING THE AUDIOVISUAL TAPE TO BE SHOWN TO THE JURY.
At the conclusion of appellee's case, after he had testified earlier, appellee offered in evidence an audiovisual tape of himself which was referred to as a "Day in the Life of Cayson." The film was approximately one hour and twenty (20) minutes in length and was viewed by the trial judge outside the presence of the jury. The lower court held that the film had probative value and would be of assistance to the jury in considering Cayson's injuries. The appellants stipulated as to the accuracy and the authenticity of the film and that Cayson was present for cross-examination by appellants, and was presented for cross-examination.
*381 The film depicted various activities of Cayson, such as waking up and moving from bed to wheelchair, attaching a catheter apparatus for urination, bowel evacuation procedures in the bathroom, taking a shower, dressing, eating breakfast, brushing teeth and shaving, exercising in a `stand-up', opening mail with his teeth, moving about the house and kitchen, driving a van, emptying a legon of urine, getting undressed and going to bed. The narration of the film by Cayson consisted of explaining what he was doing in the film. Long ago, motion pictures were held admissible in evidence in Mississippi. Barham v. Nowell, 243 Miss. 441, 138 So.2d 493 (1962); Metropolitan Life Ins. Co. v. Wright, 190 Miss. 53, 199 So. 289 (1940). It is elementary that photographs with probative value are admissible [even though gruesome, they may be admitted, if the court does not abuse its discretion].
In the recent case of Jesco, Inc. v. Shannon, 451 So.2d 694 (Miss. 1984), the jury was allowed to watch a film of normal burn treatment procedures, although not depicting the treatment received by Shannon. Prior to trial, a motion in limine was filed by the defendant to exclude the film from evidence. The lower court permitted use of the film to describe normal burn treatment procedure, which was substantially the same treatment received by Shannon. The Court said at page 702:
The introduction of photographs and motion pictures is a matter for the sound discretion of the trial court and that court is afforded wide latitude in exercising this discretion. Niles v. Sanders, 218 So.2d 428 (Miss. 1969); Marr v. Nichols, 208 So.2d 770 (Miss. 1968). See also, Butler v. Chrestman, 264 So.2d 812 (Miss. 1972).
In Butler, an 8 MM movie film which "depicted an agonizing period during (the plaintiff's) recovery" was viewed by the jury as evidence of her pain and suffering. The Court reversed and remanded the case, holding that:
Where the only purpose of photographs is to influence and prejudice the jury they should be excluded, but where they visualize the injury at a stage subsequent to the accident, they may not be excluded solely because they may contain emotional overtones. Jensen v. South Adams County Water and Sanitation District, 149 Colo. 102, 368 P.2d 209 (1962), and Godvig v. Lopez, 185 Ore. 301, 202 [sic] [202 P.2d 935 (1949)] (Id. at 816).
Caution again is stated to trial judges to preview such evidence to determine its probative value as against its prejudicial effects upon a jury.
The Court upholds here the trial court's discretion, and does not find an abuse of that discretion in his decision on this point.
451 So.2d at 702.
Appellants argue that the narrative by Cayson was cumulative of his testimony previously given. We do not think so. The sequence of the appellee's proof was to offer the film at the conclusion of the oral and documentary evidence, and it was proper for him to identify and explain what he was doing in the film. It portrayed Cayson's disability from his injury, was more accurate and authentic as to him than the film in Jesco. In Caprara v. Chrysler Corp., 71 A.D.2d 515, 423 N.Y.S.2d 694, 698-89 (1979), the New York court discussed the question of whether a motion picture film was cumulative, and said:
Crysler contends that the motion picture was not essential to plaintiff's case and that it was cumulative and highly prejudicial. Chrysler takes the position that prior to the showing of the movie, there was ample uncontradicted medical testimony and that the movie was shown to arouse, intensify and appeal to the jury's emotions. Whether a motion picture is admissible is a matter within the sound discretion of the trial court... . Here, the 10-minute film illustrated in an informative manner the impact the injury has had on plaintiff's life, and while the scenes are undoubtly unpleasant, so too is plaintiff's injury. We believe that the probative value of the film outweighed *382 any prejudice which might result. The trial court first viewed the movies in chambers, and we cannot say that it abused its discretion in allowing the film into evidence. Moreover, the mere fact that there is ample uncontradicted medical testimony concerning the nature and extent of plaintiff's injuries should not, in and of itself, prevent a plaintiff from showing to the jury a motion picture illustrating in an informative and noninflammatory manner the impact that the accident has had on his or her life.
The reasoning of the South Carolina Court in Holmes v. Black River Electric Coop., 274 S.C. 252, 262 S.E.2d 875 (1980), almost parallels the precedent of this Court when it said:
Black River submits that pictures of Holmes' injured and amputated arm should not have been admitted in evidence because they may have aroused the sympathy of the jury to its prejudice. It is argued that the injuries depicted in the photographs were hideous, grotesque, and grossly unfair. The admission or exclusion of evidence at trial is addressed to the sound discretion of the judge... . There is no contention that the pictures do not accurately reflect Holmes and his injuries at the time the photographs were taken. There can be no doubt but that they prejudiced the defendant's case in the sense that they were detrimental, but they showed a condition which Holmes was entitled to either describe to the jury in words or by pictures, or a combination of the two. This demonstrative evidence aided the jury in its evaluation of the injuries and pain suffered. It cannot be said that they were introduced in evidence for the sole purpose of inflaming the minds of the jury; they served the proper purpose of bringing vividly to the jurors the details of tremendous injuries. The pictures were certainly admissible as a matter of discretion by the trial judge, if not as a matter of right. We find no error.
262 S.E.2d at 878.
We are of the opinion that the lower court did not commit error in admitting the audiovisual film into evidence and that the objections to the film were properly overruled.

IV.

THE LOWER COURT ERRED IN GRANTING INSTRUCTION P-28 WHICH ASSUMES AS A MATTER OF LAW FACTS THAT ARE IN ISSUE.
Instruction P-28 follows:
The Plaintiff charges the Defendant Dr. James T. Trapp with the following acts of negligence:
(a) He failed to inform the Plaintiff that there was an alternate diagnostic procedure known as a catscan [sic] that might have revealed sufficient information to make a proper diagnosis in this case.
(b) He entered the thyrocervical trunk with a catheter and injected dye or contrast media into the thyrocervical trunk when he had no permission to be there.
(c) He violated the standard of care in the Tupelo, Mississippi area by getting the patient to sign an informed consent form prior to talking to the Plaintiff at all and prior to discussing any of the risks involved for this diagnostic procedure.
(d) He failed to diagnose and failed to treat the spinal cord injury and he erroneously diagnosed the injury as a myocardial infarction.
(e) He performed an unnecessary arteriogram on Plaintiff.
If you find from a preponderance of the evidence that Defendant Dr. James Trapp is guilty of any of the above acts of negligence, if any, and that said acts, if any, proximately caused or contributed to the injuries of Plaintiff John Cayson, then you will find for the Plaintiff against the Defendants Dr. James T. Trapp and Radiology of Tupelo, P.A.
Appellants objected to the over-all language of Instruction P-28, and specifically objected to subsection (a) on the ground that it assumes a CAT scan is an alternative *383 procedure as a matter of law when it should be an issue on facts of the case. Also, the appellants specifically objected to subsection (c) on the ground that it was argumentative and was an incorrect statement of the issue, which amounts to a peremptory instruction for the appellee.
The instruction peremptorily tells the jury that there are five acts of negligence charged against Dr. Trapp by Cayson. Even though the words "if any" are added to the last paragraph of the instruction, those words do not remove or diminish the vice of the entire instruction. In addition, subparagraph (a) is vague and speculative (CAT scan that might have revealed sufficient information). Likewise, the matters contained in subparagraphs (b), (c), (d) and (e) were not properly stated and submitted to the jury.
Dr. Robertson testified that, in his opinion, the probable cause of Cayson's injury was the injection of dye into the artery. This precise and basic fact was not even submitted to the jury, although an attempt was made at doing so in subsection (b) of the instruction. The instruction in its entirety is so poorly drawn and worded that it does not properly submit the issues to the jury and, in all probability, was confusing to the jury. See Davion v. Williams, 352 So.2d 804 (Miss. 1977); McArthur v. Pruitt, 244 Miss. 649, 145 So.2d 163 (1962); and Moore v. Taggart, 233 Miss. 389, 102 So.2d 333 (1958).
The jury should have been instructed as to the duty owed by Dr. Trapp to Cayson; that the jury must believe by a preponderance of the evidence Dr. Trapp violated that duty and negligently did, or failed to do, certain acts, which proximately caused or contributed to Cayson's injuries. Those important essentials should have been stated in clear and unmistakable terms.
Instruction P-28 was clearly erroneous and was not cured by any addition or amendment by the words "if any" at two places in the last paragraph. Dr. Trapp's objection was not waived by the addition of those words. Therefore, the judgment of the lower court must be reversed and the case remanded for a new trial on all issues.

V.  VII.
The remaining three (3) assignments of error involve an "Allen" instruction, the weight of the evidence and amount of the verdict. Since the case is reversed for a new trial, it is not necessary to discuss those assignments here. However, we point out that the lower court gave a form of "Allen" instruction which has been condemned by this Court and held to be reversible error in Murphy v. State, 426 So.2d 786 (Miss. 1983). On retrial, that instruction in any of its forms, other than that expressly approved by this Court, should not be given.[3]

CROSS-APPEAL
Cayson cross-appeals as to North Mississippi Medical Center, being aggrieved at the action of the lower court in sustaining the motion for directed verdict in favor of that institution. He principally contends that NMMC is liable because (1) nurses of the hospital obtained his signature on an informed consent form and (2) Dr. Trapp was an agent of NMMC.
The record reflects that two nurses of NMMC obtained the signature of Cayson on a consent form and signed as witnesses. However, it is uncontradicted that Dr. Trapp subsequently talked to Cayson and explained the arteriogram procedure, and he testified that Cayson understood same. Cayson argues that Dr. Trapp explained that procedure to him at a time when he was under sedation and did not understand what was told him. Dr. Robertson testified:

*384 I think it was a departure from the standard medical care in Tupelo, Mississippi, in the way that informed consent was obtained for the reason that Mr. Cayson was under sedation when the procedure was explained to him and therefore could not give a reasonable evaluation to the explanation that was given to him regarding hospital risk to his person... . If the patient is unsedated and in complete possession of all his faculties, and is a person of reasonable intelligence and the doctor explains it to him, that is the informing part. And if the patient tells the doctor that he consents, then that is the informed consent... . It would be improper for an RN, for an LPN, or a radiology technician to undertake to explain the procedure and risk to the patient. The consent form would be evidence of informed consent, but it would have nothing to do with the actual consent. (See Abstract, pp. 148, 170)
We are of the opinion that the nurses, in obtaining Cayson's signature to the consent instrument and witnessing same, did not impose liability upon NMMC.
We have carefully considered the record with reference to the question of agency between Dr. Trapp and Radiology of Tupelo, P.A., and NMMC. NMMC's brief succinctly states the facts on that question:
The nature of the professional relationship between Dr. Trapp and the Hospital requires evaluation in light of the theory of ostensible agency urged by cross-appellant. Dr. Trapp had no contract with the Hospital in 1977 and he has no contract now. He is a member of Radiology of Tupelo, P.A. These radiologists have a private office in Tupelo where they practice radiology. No contract or agreement exists between the professional association and the Hospital. As members of the medical staff who agree to abide by the Hospital's bylaws and regulations in return for the privilege of practicing in the Hospital, the radiologists must provide coverage for the radiology department by requiring that one radiologist be on call and available at all times to render radiological services.
The only control the Hospital has over the radiologists is through the credentialing process and audits of the work of the department which are reviewed by committees of the medical staff. This is the same for all departments in the Hospital. The Hospital does not control or direct the radiologist or the manner in which he performs his services. The Hospital does not select the radiologist for the patient; the radiologists set their own schedule. Regarding arteriograms, the physician who orders the test can request a certain radiologist. In addition, the patient may request a specific radiologist and such a request would be honored.
The Hospital does not pay Dr. Trapp any salary or percentage or any other compensation. The Hospital does not pay the salary of any doctor that practices in its radiology department nor does it bill for any of their services. The radiologists handle their own billing. A patient brochure is given to every patient upon admission to the hospital. It states that radiologists, pathologists, and anesthesiologists will bill separately for their services.
The Hospital furnishes all of the equipment in the radiology department of the hospital. It provides the supplies, film, technical assistance, and everything "except the doctors' services themselves."
Dr. Gary was Cayson's general physician. After a series of tests performed by him, he consulted with other physicians and then he ordered an arteriogram. The record is not clear as to whom he ordered the arteriogram from, but it is reasonable to infer that he ordered it from Dr. Trapp or Radiology of Tupelo, P.A., since the latter was the only radiological clinic in Tupelo.
In Hardy, Admx. of Est. of Ewing v. Brantley and Hinds General Hospital, 471 So.2d 358 (Miss. 1985), the Court held that Hinds General Hospital was liable for the acts of Dr. Terry K. Brantley, an emergency *385 room physician. However, we distinguish Hinds General from the case sub judice. In Hinds General, there was a contract between the hospital and the physician. The patient went to Hinds General and was seen and treated in the emergency room by Dr. Brantley, who was not selected by him and who was unknown to him. In Hinds General, the hospital billed the patient for services, collected those charges, and handled all the records, which procedure differed from NMMC. In Hinds General, the Court said:
Where a hospital holds itself out to the public as providing a given service, in this instance, emergency services, and where the hospital enters into a contractual arrangement with one or more physicians to direct and provide the service, and where the patient engages the services of the hospital without regard to the identity of a particular physician and where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment, the doctrine of respondeat superior applies and the hospital is vicariously liable for damages proximately resulting from the neglect, if any, of such physicians. By way of contrast and distinction, where a patient engages the services of a particular physician who then admits the patient to a hospital where the physician is on staff, the hospital is not vicariously liable for the neglect or defaults of the physician.
471 So.2d at 371.
Therefore, we are of the opinion that the lower court did not commit error in sustaining the motion for a directed verdict in favor of NMMC, and that the case should be affirmed on cross-appeal.
REVERSED AND REMANDED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL.
PATTERSON, C.J., WALKER, P.J., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] There were no available facilities at NMMC for preparing a CAT scan. The closest facility was Memphis, Tennessee.
[2] Cayson no longer suffers from headaches and ringing in the ears. The headaches disappeared when Cayson was treated for allergies.
[3] The "Allen" instruction in Murphy v. State, supra, was given by the trial judge in the case sub judice. It was in practically the identical language here and was held to constitute reversible error. However, appellant here did not object to the instruction and failed to preserve it for our consideration.