## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 96-CA-01238-SCT

*B.L. SULLIVAN, M.D., WILLIAM R. FORD, JR., M.D., AND MARY L. S. GAINES, M.D., INDIVIDUALLY AND AS PARTNERS OF RADIOLOGY CLINIC*

*v.*

*BAPTIST MEMORIAL HOSPITAL-GOLDEN TRIANGLE, INC., BAPTIST MEMORIAL HEALTH CARE SYSTEM, INC., DAVID C. HOGAN, J. STUART MITCHELL, TEAM RADIOLOGY AND D. SKIP SALLEE, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/26/96 |
| TRIAL JUDGE: | HON. HOWARD Q. DAVIS JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | PAUL DAVIS |
| | ROBERT B. MARSHALL, JR. |
| ATTORNEYS FOR APPELLEES: | MARGARET G. KLEIN |
| | JAMES L. JONES |
| | THOMAS L. SEGREST |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 10/29/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/19/98 |

**BEFORE PITTMAN, P.J., ROBERTS AND SMITH, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Plaintiffs B. L. Sullivan, William R. Ford, Jr., and Mary L. S. Gaines (collectively as "Plaintiff doctors") are board certified radiologists doing business as a partnership, the Radiology Clinic. As individuals and as partners, Plaintiff doctors brought suit in the Circuit Court of Lowndes County for actual and punitive damages as well as injunctive relief against Baptist Memorial Hospital-Golden Triangle, Inc. ("BMH-GT") and Baptist Memorial Health Care Systems, Inc. ("BMHCS"), David C. Hogan, interim administrator of BMH-GT until August of 1993, and J. Stuart Mitchell, administrator of BMH-GT since September of 1993, (collectively as "Hospital Defendants"). Plaintiff doctors also seek actual and punitive damages in addition to declaratory and injunctive relief from TEAM Radiology and D. Skip Sallee , (collectively as

"TEAM Defendants").

¶2. The relevant facts in this litigation begin in 1969 when Lowndes County opened the hospital originally known as the Golden Triangle Regional Medical Center ("GTRMC"). Prior to March 19, 1993, Lowndes County operated the hospital as a community hospital. The hospital had been built and equipped by public monies, both Federal and County. The hospital was run by the Lowndes County Board of Supervisors and the GTRMC Board of Trustees.

¶3. Dr. Sullivan became a member of the hospital's Active Medical Staff and was granted clinical privileges in radiology in 1969. In the early 1980s, Doctors Ford and Gaines became members of the Active Staff with similar clinical privileges. The privileges granted to these Plaintiff doctors were at all times limited to providing specialist services in the hospital's radiology department. The Plaintiff doctors began their partnership, known as the Radiology Clinic, in December of 1986 by executing a partnership agreement.

¶4. In August 1992, proposals were solicited from qualified non-profit health-care systems to either purchase or lease the hospital. Pursuant to authorization under Section 41-13-10, *et seq.*, Mississippi Code of 1972, as amended, the Board of Supervisors of Lowndes County, the Board of Trustees of GTRMC, and Baptist Memorial Health Care Development Corporation ("BMHCDC") entered into a Memorandum of Understanding expressing an intent to lease and then to develop the hospital into a regional referral medical center. Around January 28, 1993, BMHCDC formed BMH-GT as a non-profit corporation to carry out the Memorandum of Understanding.

¶5. On the same day, the newly formed BMH-GT Board adopted bylaws for the new corporation. These bylaws expressly authorized the hospital to enter into exclusive contracts. The new hospital bylaws also mandated that the hearing and appeal procedures set out in the Medical Staff Bylaws would not apply to the overall objectives of the institution and related policies set by the Board of Directors.

¶6. On March 19, 1993, BHM-GT leased the 326 bed non-profit community hospital for an initial term of thirty-five (35) years pursuant to the BMH-GT Hospital Lease Agreement (the "Lease"). The Lease officially changed the name of the hospital and confirmed that the corporate objective was to develop the hospital into a regional medical center. The Lease also stated that BMH-GT alone had the authority to operate the hospital in a manner it determined to be in the community's best interests and to appoint the hospital's governing board.

¶7. The Lease required BMH-GT to develop a strategic five year plan to develop the hospital as a regional medical center and to recruit appropriate physician personnel after taking into account the findings of the plan. BMH-GT as lessees also assumed certain contractual obligations of the lessors, Lowndes County, identified in Schedule 19.9. BMH-GT assumed pathology and emergency services exclusive contracts, but no other contracts with any other medical staff member were listed.[1]

¶8. At the time the Lease was executed, the Plaintiff doctors were providing the hospital with radiological services on an "open staff" system.[2] Plaintiff doctors did not have a radiologist on-site everyday all day, but their presence was available during normal business hours by the fact that the clinic was located only three hundred feet from the hospital. Once BMH-GT took control, they felt this was inadequate coverage and wanted a radiologist on-site while on duty.

¶9. However, on March 31, 1993, BMH-GT notified the Plaintiff doctors of their medical staff

reappointments.[3] The radiologists had filed their Reappointment Applications in December of 1992.[4] Each application acknowledged that medical staff appointment and clinical privileges are not rights. Each doctor agreed to abide by and be subject to the hospital and medical staff bylaws.

¶10. In the development of BMH-GT as a regional medical center, the hospital executed a new exclusive pathology services contract and entered an exclusive contract with a different emergency services provider, neither of which were challenged. Additionally, it was recommended that the hospital have two full-time on-site radiologists.[5]

¶11. BMH-GT considered its options to meet the goal of developing the hospital into a regional medical center, including: (1) obtaining adequate coverage from the Plaintiff doctors' Radiology Clinic; (2) entering into an exclusive contract with the Plaintiff doctors; (3) purchasing the Radiology Clinic from the Plaintiff doctors; (4) recruiting other radiologists in an "open staff"system; and (5) entering into an exclusive contract with another radiology group.

¶12. During the fall of 1993, TEAM Radiology President D. Skip Salle, M.D., learned that BMH-GT was searching for a radiological services provider. After contacting BMH-GT, TEAM Defendants were advised and believed that the incumbent radiologists had no written contract. Susan Hinson, then Executive Vice President and Chief Operating Officer, ultimately submitted a written proposal. As with all their contracts, TEAM Defendants required an exclusive contract for a two year period. The initial proposal was not accepted, but TEAM Defendants remained in periodic contact with BMH-GT while the hospital weighed its options.

¶13. On September 15, 1994, the BMH-GT Board passed a resolution granting the Administrator the authority to enter into an exclusive contract in order to further the hospital's goals. On September 30, 1994, BMH-GT executed an exclusive services agreement with TEAM Defendants, (the "TEAM Contract"). The TEAM contract was the result of over fifteen months of negotiations with TEAM Defendants, Plaintiff doctors, and other radiological service providers.[6] On October 4, 1994, BMH-GT enforced the exclusivity provision of the TEAM contract, which effectively locked the Plaintiff doctors out of the hospital's radiology department.

¶14. However, the TEAM Contract did not prevent the Plaintiff doctors from practicing at the Radiology Clinic or the other five area hospitals. In fact, on January 13, 1995, BMH-GT re-appointed the Plaintiff doctors to the medical staff and extended their clinical privileges for another two-year term.

¶15. On March 13, 1995, Plaintiff doctors filed a 39-page complaint asserting a total of thirteen (13) claims all arising at least indirectly from the exclusive contract between the Hospital Defendants and TEAM Defendants. Plaintiff doctors base their claims against Hospital Defendants upon various theories of liability: (1) violation of Plaintiffs' constitutional due process rights, (2) violation of Plaintiffs' statutory and regulatory due process rights, (3) violation of Plaintiffs' due process rights under the BMH-GT Medical Staff Bylaws and Credentialing Policy, (4) breach of contracts with Plaintiffs, (5) breach of contract to which Plaintiffs were third party beneficiaries, (6) breach of duty of good faith and fair dealing, (7) extortion and unlawful threats, (8) tortious interference with contractual relations, and (9) tortious interference with prospective business advantage.[7] Plaintiff doctors also seek relief against TEAM Defendants for tortious interference with contractual relations.

¶16. On January 19, 1996, Hospital Defendants moved for partial summary judgment on eight of the

claims, and on March 19, 1996, TEAM Defendants moved for summary judgment on the two claims against them. Defendants claimed that: (1) the hospital acted as a private entity and not as the state, (2) there was no contractual relationship between Plaintiff doctors and the Hospital Defendants, and (3) the hospital made a "management decision" to grant TEAM Defendants an exclusive contract.

¶17. After examining volumes of discovery, Special Circuit Judge Howard Q. Davis found neither the facts, nor the identity and authenticity of the pertinent documents to be in controversy.[8] Subsequently, Special Judge Davis held in favor of both Defendants and granted their motions.

¶18. Aggrieved, the Plaintiff doctors appeal to this Court and raise the following issues:

**I. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT THE HOSPITAL DEFENDANTS DID NOT VIOLATE THE DOCTOR'S DUE PROCESS RIGHTS UNDER ARTICLE 3, SECTION 14 OF THE MISSISSIPPI CONSTITUTION.**

**II. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT THE HOSPITAL DEFENDANTS DID NOT VIOLATE THE DOCTOR'S RIGHTS UNDER MISS. CODE ANN. § 73-25-93 AND ASSOCIATED REGULATIONS.**

**III. WHETHER THE TRIAL COURT ERRED IN REFUSING TO REVIEW THE ISSUE WHETHER THE HOSPITAL'S "MANAGEMENT DECISION" DEFENSE IS A SHAM.**

**IV. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT THE HOSPITAL DID NOT HAVE A CONTRACT WITH EACH OF THE INDIVIDUAL DOCTORS.**

**V. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT THE HOSPITAL DEFENDANTS DID NOT VIOLATE THE DOCTORS' DUE PROCESS RIGHTS UNDER THE HOSPITAL'S MEDICAL STAFF CREDENTIALING POLICY.**

**VI. WHETHER THE TRIAL COURT ERRED IN GRANTING THE TEAM DEFENDANTS' SUMMARY JUDGMENT ON THE DOCTORS' TORTIOUS INTERFERENCE CLAIMS.**

**VII. WHETHER THE TRIAL COURT ERRED IN REFUSING TO REVIEW WHETHER THE HOSPITAL FOLLOWED ITS OWN CREDENTIALING POLICY IN GRANTING PRIVILEGES TO PHYSICIANS EMPLOYED BY TEAM.**

**STANDARD OF REVIEW**

¶19. "Rule 56(c) of the Mississippi Rules of Civil Procedure allows summary judgment where there are no genuine issues of material fact such that the moving part[y] is entitled to judgment as a matter of law. To prevent summary judgment, the non-moving party must establish a genuine issue of material fact by means allowable under the Rule." ***Richmond v. Benchmark Const. Corp.***, 692 So.2d 60, 61 (Miss. 1997); ***Lyle v. Mladinich***, 584 So.2d 397, 398 (Miss. 1991).

¶20. This Court employs a *de novo* standard in reviewing a lower court's grant of summary judgment. ***State ex rel. Mississippi Ethics Comm'n v. Aseme***, 583 So.2d 955, 957 (Miss. 1991); ***Cossitt v. Federated Guar. Mut. Ins. Co.***, 541 So.2d 436, 438 (Miss. 1989). Evidentiary matters are viewed in a light most favorable to the nonmoving party. ***Palmer v. Biloxi Reg'l Med. Ctr., Inc.***, 564 So.2d 1346,

1354 (Miss. 1990). "If any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise, the decision is affirmed."*Richmond v. Benchmark Const. Corp.*, 692 So.2d 60, 61 (Miss. 1997); *Brown v. Credit Ctr., Inc.*, 444 So.2d 358, 362 (Miss. 1983).

## LEGAL ANALYSIS

### IV. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT THE HOSPITAL DID NOT HAVE A CONTRACT WITH EACH OF THE INDIVIDUAL DOCTORS.

¶21. The trial court held that as a matter of law no contract existed between Plaintiff doctors and Hospital Defendants, because "[t]here was no express intent to create a contract..." Plaintiff doctors base their contract claims on the premise that contracts were in fact formed when BMH-GT notified the doctors of their medical staff reappointment and grant of clinical privileges on March 31, 1993. This Court has held in two cases that medical staff appointment and the granting of clinical privileges do not establish an employment contract. *Trapp v. Cayson*, 471 So.2d 375, 384 (Miss. 1985); *State ex rel. Mississippi Ethics Comm'n v. Aseme*, 583 So.2d 955, 958-60 (Miss. 1991).

¶22. In *Trapp*, this Court was faced with the question of whether a radiologist accused of malpractice was an agent of the hospital. *Id*. at 384. This Court held that he was not and reasoned:

> The nature of the professional relationship between Dr. Trapp and the Hospital requires evaluation in light of the theory of ostensible agency urged by cross-appellant. Dr. Trapp had no contract with the Hospital in 1977 and he has no contract now. He is a member of Radiology of Tupelo, P.A. These radiologists have a private office in Tupelo where they practice radiology. No contract or agreement exists between the professional association and the Hospital. As members of the medical staff who agree to abide by the Hospital's bylaws and regulations in return for the privilege of practicing in the Hospital, the radiologists must provide coverage for the radiology department by requiring that one radiologist be on call and available at all times to render radiological services.

> The only control the Hospital has over the radiologists is through the credentialing process and audits of the work of the department which are reviewed by committees of the medical staff. This is the same for all departments in the Hospital. The Hospital does not control or direct the radiologist or the manner in which he performs his services. The Hospital does not select the radiologist for the patient; the radiologists set their own schedule. Regarding arteriograms, the physician who orders the test can request a certain radiologist. In addition, the patient may request a specific radiologist and such a request would be honored.

> The Hospital does not pay Dr. Trapp any salary or percentage or any other compensation. The Hospital does not pay the salary of any doctor that practices in its radiology department nor does it bill for any of their services. The radiologists handle their own billing. A patient brochure is given to every patient upon admission to the hospital. It states that radiologists, pathologists, and anesthesiologists will bill separately for their services.

> The Hospital furnishes all of the equipment in the radiology department of the hospital. It provides the supplies, film, technical assistance, and everything "except the doctors' services themselves."

*Id*. The same type of relationship existed between the Plaintiff doctors and the Hospital Defendants as between Dr. Trapp and North Mississippi Medical Center. Therefore, this Court follows *Trapp* and finds

that no contract was formed.

¶23. In *Aseme*, this Court upheld the decision in *Trapp* regarding the relationship between a hospital and a doctor who has been appointed to the medical staff. *Aseme,* 583 So. 2d at 958-960. This Court stated:

> ...[S]taff privileges serve to delimit a doctor's authority to practice in the hospital based upon the doctor's overall competence in his particular field(s) of practice. Staff privileges do not establish an employment contract with the hospital.

*Id*. at 958 (*quoting* *Engelstad v. Virginia Mun. Hosp.*, 718 F.2d 262, 267 (8th Cir. 1983)). A doctor who has been granted these privileges has basically been found to be professionally competent and is permitted to use the hospital and its facilities. *Engelstad*, 718 F.2d at 267. Plaintiff doctors would have this Court overturn such precedent based upon authority from other jurisdictions.[9]

¶24. Plaintiff doctors specifically urge this Court to accept the reasoning in *Gianetti v. Norwalk Hosp.*, 557 A.2d 1249, 1255 (Conn. 1989). The court there reasoned:

> It can hardly be said that the hospital must extend the privileges to every physician who seeks them. Once this hospital, however, has agreed to extend privileges to a physician, the hospital has changed its position with reference to that physician. By agreeing to extend privileges to the plaintiff physician, the hospital has then done something it was not already bound to do....In granting privileges, this hospital extended to the plaintiff those benefits to his medical practice that are to be gained by the use of the hospital, including its facilities and admissions to the hospital. "Whatever else the granting of staff privileges may connote, it is clear ... that it [at least] involves a delegation by the hospital [to the physician] of authority to make decisions on utilizations of its facilities." . . . In return for that, the plaintiff agreed to abide by its medical staff bylaws. Therefore, the requisite contractual mutuality was then present. . . .This agreement was supported by valid consideration. . . .The hospital changed its position by granting medical staff privileges and the plaintiff physician has likewise changed his position in doing something he was not previously bound to do, i.e., to "abide" by the hospital medical staff bylaws. Therefore, there is a contractual relationship between the hospital and the plaintiff.

*Id*. at 1254. In accord with the *Gianetti* rationale, the reappointment applications and acceptance letters reflect simple offer and acceptance with consideration flowing between the parties. However, if this Court were to accept Plaintiff doctors' argument that a contract did exist as in *Gianetti*, then it would have to overturn its own precedents. This Court is unwillingly to do so and accordingly finds no contract to have been created.

## VI. WHETHER THE TRIAL COURT ERRED IN GRANTING THE TEAM DEFENDANTS' SUMMARY JUDGMENT ON THE DOCTORS' TORTIOUS INTERFERENCE CLAIMS.

¶25. In Count Twelve of their complaint, Plaintiff doctors claim tortious interference with contractual relations against TEAM Defendants. We above held that no contract existed between the Hospital Defendants and the Plaintiff doctors. Therefore, it follows that there can be no interference with a contract.

### CONCLUSION

¶26. Because this Court holds that no contract existed, the Plaintiff doctors' other points of error are moot. Accordingly, the trial court's grant of summary judgment as to both Defendants is hereby affirmed.

¶27. **JUDGMENT AFFIRMED.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, ROBERTS AND WALLER, JJ., CONCUR. PRATHER, C.J., AND MILLS, J., NOT PARTICIPATING.**

1. Lowndes County represented that Schedule 19.9 of the Lease was a complete list of their contracts.

2. An "open staff" system is where the doctors provide services on a rotating basis, the patients are billed directly, and in this case, the hospital does not receive any portion of the fees.

3. Medical staff members are appointed to the staff and granted clinical privileges in their specialty for two-year terms. Before the expiration of the term, each physician must seek reappointment by submitting a Reappointment Application and an Application for Privileges.

4. Re-application is required every two years by Article III, Part A, Section 1 of the credentialing policy.

5. Tribrook Management Consultants was hired to study the hospital and community needs and make recommendations on improvements to BMH-GT in order to meet its goals.

6. Several other radiological service providers submitted proposals to BMH-GT, most of which also included exclusive contract clauses.

7. Items (7), (8), and (9) are not included within the subject of Hospital Defendants' Motion for Partial Summary Judgment.

8. Because he personally and family members had been treated by the Plaintiff doctors, the Honorable John M. Montgomery, Circuit Court Judge of Lowndes County, recused himself on August 1, 1995, from this case upon these disclosures and a subsequent motion for recusal was made by all of the Defendants. This Court specially appointed the Honorable Howard Q. Davis as Special Circuit Judge for this case under the authority of Miss. Code Ann. § 9-1-105 (Supp. 1994).

9. As *amici curiae*, the Mississippi State Medical Association ("MSMA") and the American College of Radiology ("ACR") urge this Court to accept Plaintiff doctors' argument that a contract did in fact exist with the Hospital Defendants. MSMA and ACR cite authority from Pennsylvania, Wisconsin, Tennessee, and Connecticut. The ACR believes that exclusive contracts should not be used to circumvent the hospital bylaws.

Furthermore, they contend that the holding in *Aseme* is distinguishable from the instant case, because the Plaintiff doctors did not rely solely on their staff appointments as had Dr. Aseme, but also submitted copies of their applications, the hospital bylaws, the staff bylaws, and the credentialing policy as well as other documents.