## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00269-SCT

*RUTHIE GATLIN*

*v.*

*METHODIST MEDICAL CENTER, INC. AND DR. DAVID CARLSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/26/1998 |
| TRIAL JUDGE: | HON. ERMEA JACKSON RUSSELL |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | ROBERT L. WELLS |
| ATTORNEYS FOR APPELLEES: | STUART ROBINSON, JR. |
| | C. STEPHEN STACK, JR. |
| | SHERRY S. FERNANDEZ |
| | JAMES T. McCOLGAN, III |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 12/14/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 1/4/2001 |

**BEFORE PRATHER, C.J., MILLS AND COBB, JJ.**

**PRATHER, CHIEF JUSTICE, FOR THE COURT:**

### STATEMENT OF THE FACTS

¶1. On January 14, 1995, twenty-one year old Donaly Floyd Williams, Jr. ("Williams") of Jackson was shot three times while he was being robbed. Williams was taken by ambulance to the Methodist Medical Center ("Methodist") in Jackson. Williams was conscious upon his arrival at the hospital, although unable to speak due to the presence of a breathing tube in his throat. Williams was kept in the emergency room until 11:00 a.m. while hospital staff waited for the anesthesiologist, defendant Dr. David Carlson, to arrive. During this time, Williams's mother, Ruthie Gatlin ("Gatlin") arrived at the hospital.

¶2. At 11:25 a.m. Dr. Fred Rushton, a surgeon on staff at Methodist, with the assistance of Dr. Carlson, began a surgical procedure to "patch up the holes" in Williams's body. Dr. Rushton testified that "at some point during the operation ... we received word through a nurse at the blood bank that there was no further blood available in the hospital or in the city." Gatlin contends that this (apparently erroneous) conclusion was the result of a tragic and negligent miscommunication between Dr. Carlson and the hospital's blood bank personnel.

¶3. Jane Allison, formerly the blood bank supervisor at Methodist, testified at trial that the Methodist

hospital blood bank "did not run out of blood" on January 14, 1995. Allison further testified that it was the responsibility of the physician to make requests for changes in the blood type and that the blood bank fulfilled all blood requests which were made by the physicians operating on Williams. Dr. Carlson, by contrast, testified that he was relying on the blood bank personnel to make the necessary changes in the blood type and that it was their responsibility, rather than his own, to ensure that these changes were made. Dr. Carlson acknowledged that, after he was informed that the hospital was out of blood, he did not make additional inquiries with the blood bank.

¶4. Williams died during surgery at 1:40 p.m. Although Dr. Rushton testified that hypothermia was the "terminal event" causing Williams's death, he also conceded that loss of blood was "a factor" in Williams's death and that "we would have certainly liked to have had more blood." Dr. Herbert Ferrari, Gatlin's expert witness as to Dr. Carlson's negligence, testified that, in his opinion, Williams would have "probably" had a "seventy percent" chance of survival if he had received proper treatment. Dr. Ferrari testified that, in his opinion, Dr. Carlson had failed to exercise the minimal level of care required of an anesthesiologist, and that, as a result, Williams' chances of survival were "probably close to zero."

## STATEMENT OF THE CASE

¶5. On January 10, 1997, Gatlin filed suit against Methodist and Dr. Carlson for their alleged negligence in the death of her son. On August 27, 1998 the circuit judge directed a verdict in favor of Methodist, finding that Gatlin had failed to establish that any of the hospital's blood bank personnel were negligent. The judge also directed a verdict in favor of Dr. Carlson, finding that, although Gatlin had established a fact issue as to Dr. Carlson's negligence, she had nevertheless failed to legally establish a right to recover any damages for the wrongful death of her son. Feeling aggrieved, Gatlin appeals to this Court.

## ISSUES

**I. Did the court err when it granted Methodist Medical Center's motion for directed verdict on the grounds that there was no proof that any negligence by it caused or contributed to Mr. Williams' death?**

¶6. The first issue on appeal arises from the trial court's decision to grant a directed verdict in favor of Methodist as to liability. This Court conducts a de novo review of directed verdicts. If the Court finds that the evidence favorable to the non-moving party and the reasonable inferences drawn therefrom present a question for the jury, the motion should not be granted. *Pace v. Financial Sec. Life*, 608 So.2d 1135, 1138 (Miss.1992). Additionally, this Court has held that "[a] trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree." *Vines v. Windham*, 606 So.2d 128, 131 (Miss.1992).

¶7. On appeal, Gatlin raises two theories under which Methodist might be held liable. The first theory of recovery is a direct respondeat superior theory for the negligence of the blood bank personnel who, Methodist concedes, are employees of the hospital.[1] The testimony at trial clearly established that there was confusion between the surgical staff and blood bank personnel as to the availability of blood which could be used by Williams. The evidence at trial indicated that Williams had type B- blood, and that persons with this blood type can receive that blood type, as well as types B+, O- and O+ in the event that the hospital runs out of the patient's primary blood type. A central issue at trial involved whether the anesthesiologist or blood bank personnel were responsible for failing to secure the blood which was

available for Williams's surgery.

¶8. Gatlin's only expert witness at trial, Dr. Ferrari, testified that the party responsible for coordinating the blood transfusion was the anesthesiologist, Dr. Carlson. Dr. Ferrari testified that, upon being informed that there was no blood available, a minimally competent anesthesiologist should "call or have someone to call anybody that has authority to procure blood all the way up to the director of the blood bank." Although not called as an expert witness by the plaintiffs, Dr. Rushton similarly testified that "generally it's the anesthesiologist who asks for any further blood."

¶9. The general rule is that medical negligence may only be established by expert medical testimony, unless a layman can observe and understand the negligence as a matter of common sense and practical experience. *Coleman v. Rice*, 706 So.2d 696, 698 (Miss. 1997). Gatlin presented no expert testimony at trial as to the standard of care of blood bank personnel,[2] and it appears that Gatlin's theory is that the primary negligence lay with Dr. Carlson. Methodist notes that Dr. Carlson argued in his own defense that responsibility for failing to secure the blood needed by Williams lay with the blood bank personnel, rather than himself. However, Dr. Carlson was not qualified to testify as to the standard of care of blood bank personnel and, as a defendant in this case, he obviously had an interest in testifying that responsibility for the failure to use the blood that was available to save Williams lay elsewhere.

¶10. By only eliciting expert testimony as to an anesthesiologist's standard of care, it appears that Gatlin made a conscious decision to focus her case upon the alleged negligence of Dr. Carlson. Indeed, Gatlin's primary argument on appeal is that Methodist should be held vicariously liable for Dr. Carlson's negligence based upon this Court's decision in *Hardy v. Brantley*, 471 So.2d 358 (Miss. 1985). This Court's decision in *Hardy* represented a new, and greatly expanded, theory of liability in hospital negligence cases. The *Hardy* theory of vicarious liability is based primarily upon the relationship between the patient and the health care provider, rather than upon the relationship between the hospital and its physicians.

¶11. Indeed, this Court in *Hardy* was faced with a contract between a hospital and emergency room physician which expressly provided that the physician was "at all times acting and performing as an independent contractor." *Hardy*, 471 So.2d at 361-62. In spite of this contractual language, this Court in *Hardy* found the hospital to be vicariously liable for the negligence of the physician, holding that:

> The hospital and emergency room physicians (or any other health care providers for that matter), of course, are free to make as between themselves whatever agreement they may desire. ... Our concern, however, regards the rights and duties of the hospital vis-a-vis the patient, not the emergency room physician.

*Id.* at 369. The central holding of *Hardy* was as follows:

> Where a hospital holds itself out to the public as providing a given service, in this instance, emergency services, and where the hospital enters into a contractual arrangement with one or more physicians to direct and provide the service, and where the patient engages the services of the hospital without regard to the identity of a particular physician and where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment, the doctrine of respondeat superior applies and the hospital is vicariously liable for damages proximately resulting from the neglect, if any, of such physicians. By way of contrast and distinction, where a patient engages the services of a particular physician who then admits the patient to a hospital where the physician is on staff, the

hospital is not vicariously liable for the neglect or defaults of the physician.

*Id.*

¶12. The *Hardy* analysis thus focuses primarily upon the patient's motivation for utilizing the hospital's services, rather than upon the relationship between the hospital and the physician working at the hospital. Specifically, the *Hardy* analysis seeks to determine whether the patient was seeking treatment from the hospital, without regard for the identity of the particular physicians working at the hospital, or whether the patient instead sought the services of a particular physician who merely happened to be on staff at a particular hospital.

¶13. In a 1993 law journal article, John Marshall Law School professor John Dwight Ingram approvingly discussed *Hardy* and similar decisions from other jurisdictions, writing that:

> Because hospitals invite the public to rely on their competence in the provision of health care, it seems eminently fair to allow the public also to rely on the hospital as a guarantor of compensation if something goes wrong. The hospital will be entitled to indemnification from a negligent physician, and the ultimate economic burden will fall, as it should, on the person who was at fault. In this way, users of medical services will be better protected against the losses resulting from medical malpractice, with minimal ultimate expense to the hospital. The hospital can readily reduce or eliminate its exposure to claims by carefully selecting and supervising all physicians who provide services in the hospital, and requiring that they are financially responsible.

John Dwight Ingram, *Liability of Medical Institutions for the Negligence of Independent Contractors Practicing on the Premises*, 10 J. Contemp. Health L. & Pol'y 221, 229-30 (1993).

¶14. It is important to note, as stated by Professor Ingram, that a party which is held vicariously liable for the negligence of another generally has a right to seek indemnity from that person under common law principles. *W.J. Runyon & Son, Inc. v. Davis*, 605 So.2d 38, 48 (Miss. 1992), citing *Granquist v. Crystal Springs Lumber Co.*, 190 Miss. 572, 582, 1 So.2d 216, 218 (1941)(overruled on other grounds, *Richardson v. APAC-Miss. Inc.*, 631 So.2d 143 (Miss. 1994). This right of indemnity is obviously much more valuable if the hospital elects to associate itself with physicians who are able to satisfy any judgments entered against them. As such, a hospital can greatly reduce its financial exposure by associating itself with physicians who are financially responsible and professionally competent. It is clearly in the best interests of patients and society that hospitals have an incentive to do so, and *Hardy* provides hospitals with such incentive. In the event that the hospital elects to associate itself with physicians who are unable to take financial responsibility for their own negligence, then a hospital can and should serve as a guarantor of the plaintiff's recovery if the *Hardy* requirements are satisfied.

¶15. It appears that the present case presents a rather classic example of vicarious liability under *Hardy*. Indeed, this Court in *Hardy* specifically noted that "(a)lthough there may be important factual variations from case to case, a patient's non-selection of his physician is often the rule in the case of *anesthesiologists*, radiologists and particularly emergency room physicians." *Id.* at 371 (emphasis added). Gatlin has filed suit against anesthesiologist Dr. Carlson, and Methodist does not contend that Williams was even aware of the fact that Dr. Carlson worked at the hospital prior to being admitted there.

¶16. In response, Methodist focuses on what, it asserts, is the lack of a contract between Methodist and

Dr. Carlson. Methodist notes that part of the *Hardy* holding was a requirement that a "hospital enter ... into a contractual arrangement with one or more physicians to direct and provide the service." Methodist asserts that Dr. Carlson was merely a staff physician and submits that Gatlin introduced no proof of a contract between Dr. Carlson and Methodist. In asserting that the existence of a contract was not proven, Methodist primarily relies on this Court's decision in *Trapp v. Cayson*, 471 So.2d 375 (Miss. 1985). In *Trapp*, this Court found that a hospital was not vicariously liable for a physician's negligence, distinguishing *Hardy* due *in part* to the fact that "there was a contract between the hospital and the physician" in *Hardy*. *Trapp*, 471 So.2d at 385. This Court in *Trapp* thus implied, but did not expressly hold, that there was not a contract between the hospital and physician in *Trapp*.

¶17. However, a closer reading of *Trapp* indicates that this Court was not basing its holding solely or even primarily upon the apparent "lack of contract" between the hospital and staff physician in that case. This Court in *Trapp* distinguished *Hardy* based in large part upon the patients' differing motivations for seeking the hospitals' services in the two cases. In *Trapp*, this Court inferred from the record that the patient had sought the services of a radiologist at the hospital based upon a referral from the patient's own personal physician. This Court noted in *Trapp* that:

> Dr. Gary was Cayson's personal physician. ... The record is not clear as to whom he ordered the arteriogram from, but it is reasonable to infer that he ordered it from Dr. Trapp or Radiology of Tupelo, P.A. since the latter was the only radiological clinic in Tupelo.

*Trapp*, 471 So.2d at 381. As such, the facts of *Trapp* can be distinguished from those of a typical *Hardy* case, given that the patient in *Trapp* sought (upon referral by his own physician) the services of a physician who merely happened to be on staff at the hospital. Under the *Hardy* analysis, the patient was thus seeking the services of the physician rather than that of the hospital, and the hospital was thus not held to be vicariously liable.

¶18. This Court in *Hardy* and *Trapp* did appear to place *some* weight on the nature of the arrangement between the hospital and physician, but neither opinion sets forth any meaningful standard in making a determination in this regard. It is true that this Court has held that the granting of staff privileges to a physician at a hospital, standing alone, does not constitute a contractual relationship. *See*:*Mississippi Ethics Comm'n v. Aseme*, 583 So.2d 955, 958-60 (Miss. 1991). The granting of staff privileges, without more, may be analogized to a mere license or recognition of the physician's competence on the part of the hospital. However, once the relationship between the hospital and the physician materializes into the actual rendition of services, the existence of some form of contract between the hospital and physician becomes apparent.

¶19. Indeed, strictly speaking, a staff physician who merely agrees to perform one operation or procedure on behalf of a hospital can be said to have engaged in a "contract" with the hospital as to that particular procedure. In such a situation, the physician agrees to provide his time, skill and expertise to the hospital in exchange for the hospital's allowing him access to its facilities and patients. As such, there is an offer, acceptance, and consideration provided by each party, and the contractual nature of this arrangement is clear, as to that particular procedure. Nevertheless, it is apparent that this Court in *Hardy* and *Trapp* was concerned with the existence of an ongoing contractual *relationship* between the hospital and physician, rather than the existence of a contract to perform a particular procedure.

¶20. In the view of this Court, the best indication as to the extent of a physician's contractual relationship

with a hospital is the extent to which the physician actually practices at the hospital. Hospitals and their attorneys will always try to minimize liability through the drafting of contracts with independent contractor language, by not drafting any written contracts at all, or by contracting indirectly with corporate practice groups. It is well established, however, that a contract can and does arise through actions and unwritten agreements as much as through a carefully drafted written contract.[3]

¶21. It is clear that a physician who has staff privileges at a hospital may also develop an extensive contractual relationship with a hospital, even without a salaried position and/or a written contract. In the present case, for example, Dr. Carlson testified that, at the time of the Williams' death, "virtually one hundred percent" of his anesthesiology practice was at Methodist. By way of comparison, Dr. Rushton testified that he had staff privileges at several Jackson area hospitals and that "probably 55 to 60 percent" of his surgeries were performed at Methodist, while the rest of his surgeries were "mostly at Baptist, occasionally St. Dominic, River Oaks occasionally." These facts illustrate that the mere granting of staff privileges, standing alone, does not give a clear or complete picture as to the relationship between a particular physician and hospital. As such, it should be clear that any blanket characterization of physicians who enjoy staff privileges at a given hospital would be ill-advised.

¶22. This Court concludes that, considering the facts in the light most favorable to Gatlin, there was sufficient evidence for a reasonable trier of fact to conclude that Methodist should be held liable under *Hardy*. The very extensive nature of Dr. Carlson's practice at Methodist constitutes one factor in support of a finding that Methodist should be held vicariously liability for the negligence of Dr. Carlson in the present case. The jury could also reasonably find that Methodist held itself out to the public as providing emergency services. Most importantly under the *Hardy* analysis, a trier of fact could reasonably conclude that Williams obtained Methodist's services without regard to, or even knowledge of, the identity of any particular physicians at Methodist. Gatlin was able to establish a jury issue as to Methodist's liability under *Hardy*, and the trial court accordingly erred in granting Methodist's motion for directed verdict.

**II. Did the trial court incorrectly find that no damages for the wrongful death of Mr. Williams was proven and the trial court made four separate errors?**

**A. The court ruled that a life expectancy table of the beneficiaries is a prerequisite to showing any past or future loss of society and companionship, and it ignored the loss of society and companionship between the date of death and the trial of the case as damages shown in this matter.**

**B. The court ruled that the funeral expenses could not be allowed without proof that they have been actually paid by the beneficiaries.**

**C. The court did not allow plaintiff's case to proceed to the jury on the issue of nominal and punitive damages alone, which are sufficient elements of damages in wrongful death case to allow a jury to decide the case.**

**III. Did the trial court err by refusing to allow plaintiff to reopen her case of the sole and simple purpose of putting into evidence a life expectancy table to satisfy the court's insistence that a life expectancy table of the beneficiaries is a prerequisite to any proof of loss of society and companionship of the mother of the decedent?**

¶23. Also at issue in the present appeal is whether Gatlin presented sufficient proof to entitle her to recover wrongful death damages in the present case. Although the trial judge concluded that Gatlin had established a fact issue as to Dr. Carlson's liability, she nevertheless found that Gatlin had failed to establish a right to recover any of the damages available in a wrongful death action. This Court should affirm this finding only if, considering the facts in a light most favorable to Gatlin, she established no right to recover wrongful death damages at all for the death of her son. *Little v. Bell*, 719 So.2d 757, 760 (Miss.1998).

¶24. At the very minimum, this Court concludes that Gatlin established a jury issue as to her loss of the society and companionship of her son. Miss. Code Ann. § 11-7-13 (Supp. 2000) provides that "(i)n such action the party or parties suing shall recover such damages as the jury may determine to be just taking into consideration all the damages of every kind to the decedent and all damages of every kind to any and all parties interested in the suit." This statutory language has been held to include funeral and medical expenses of the decedent, the present net cash value of the life expectancy of the decedent, the loss of society and companionship of the decedent, the pain and suffering experienced by the deceased between the time of the injury and the subsequent demise, and punitive damages. *McGowan v. Estate of Wright*, 524 So.2d 308, 311 (Miss.1988) (citing *Jesco, Inc. v. Whitehead*, 451 So.2d 706, 710 (Miss.1984); *Thornton v. Insurance Co. of North America*, 287 So.2d 262, 266-67 (Miss. 1973).

¶25. Gatlin appears to have consciously elected, as her litigation strategy, to forego recovery for certain wrongful death damages, such as the present net cash value of her son's life. Methodist argues[4] that, in so doing, Gatlin was motivated by a desire to prevent certain negative information regarding her son and his employment history from being presented to the jury. Gatlin's motivation for failing to present evidence of her son's earnings potential is of no concern to this Court, but her failure to do so clearly precludes her recovery for the present net cash value of her son's life. Gatlin does not argue otherwise on appeal, although she strenuously argues that she was able to establish a right to recover for other wrongful death damages, including funeral expenses and the loss of society and companionship of her son.

### (1) Loss of Society and Companionship

¶26. The trial judge ruled that Gatlin had failed to establish a right to recover for the loss of society and companionship of her son, based on her failure to introduce evidence of *her own* life expectancy. In support of this ruling, the trial judge cited the 1934 case of *Goodyear Yellow Pine Co. v. Anderson*, 171 Miss. 530, 157 So. 700 (1934), in which this Court reversed a wrongful death award based on the fact that the wrongful death beneficiary had failed to introduce proof of her own life expectancy. In so ruling, this Court stated that:

> The rule now in force in Mississippi is that the measure of recovery is limited to the period of the life expectancy of the beneficiary, if it be shorter than that of the person killed, or to that of the deceased, if it be shorter than that of the beneficiary.

*Anderson*, 157 So. at 701, (citations omitted). This rule of law, as stated in *Anderson*, appears to have found its most recent judicial expression in that 1934 case. No subsequent cases cite *Anderson* for the proposition that a wrongful death *beneficiary* (or at least one older than the decedent) is required to introduce evidence of her own life expectancy in order to recover for a loss of society and companionship, and Methodist cites no more recent cases in support of this proposition.

¶27. At any rate, Gatlin correctly notes that this Court in *Anderson* did not reverse and render based on

the beneficiary's failure to introduce evidence of her own life expectancy, but instead elected to reverse and remand for a determination of damages. *Id.* at 157. Thus, the better view is that the holding in *Anderson* constitutes a mere limitation on damages, rather than a basis for granting a directed verdict or for rendering judgment on appeal.

¶28. Indeed, this Court stated:

> With respect to the other element of damages submitted to the jury, that is, the reasonable expectation of gifts and contributions, it would have been desirable for the proof to have shown the true life expectancy of the deceased and of Mrs. Montgomery, to whom she had been making contributions. It was pointed out in Avery v. Collins, supra, that damages because of loss of expected gratuities 'must be based on evidence of previous gratuities, as well as upon the respective life expectancies, otherwise the issue would degenerate into mere possibilities, or speculations or conjectures.' However, this Court has held that proof of the age of a party and of his condition of health will give the jury a sufficient basis on which to determine the probable life expectancy. See *Goodyear Yellow Pine Co. v. Anderson*, 171 Miss. 530, 157 So. 700. In the case at bar, the ages of the deceased and of Mrs. Montgomery were shown and the testimony indicates that the deceased was in fair health but does not disclose the condition of the health of Mrs. Montgomery. Nevertheless, we think that the jury had sufficient facts before it to pass upon this element of the damages, and we reach this conclusion particularly because the total amount of the verdict does not appear to be exorbitant.

*Gulf, Mobile & Ohio R.R. v. White* 219 Miss. 342, 348, 68 So.2d 458, 460 (1953). While this Court's opinion in *White* was largely based upon the particular facts and proof presented in that case, it is apparent that this Court has applied a rather flexible standard regarding the proof required in establishing the life expectancy of a beneficiary.

¶29. Even assuming that the life expectancy of the beneficiary is required under *Anderson*, this Court concludes that, upon objection by Methodist at trial, the trial judge should have allowed Gatlin an opportunity to re-open her case and present evidence of her own life expectancy, as she specifically requested to do.[5] In the present case, it was certain that Gatlin has suffered *some* damages for loss of society and companionship, the only question being the extent of damages. As such, the trial court erred in granting a motion for directed verdict against Gatlin without allowing her to reopen her case.

¶30. Moreover, it is apparent that Gatlin was entitled to recover some damages for loss of society and companionship, even absent proof as to her own life expectancy. Gatlin correctly points out that, even absent proof of her own life expectancy, she should have been allowed to recover for her past loss of society and companionship in the years between her son's death and the date of trial. Clearly, no evidence of Gatlin's life expectancy was necessary for her to recover her past loss of companionship with her son as of the date of trial, and the existence of such damages were clearly established through Gatlin's testimony at trial.

¶31. In response to this argument, Dr. Carlson offers only speculation that Gatlin's son might have had AIDS, cancer or other such disease limiting his life expectancy to a period even shorter than the three years intervening between his death and trial. Clearly, an unsupported argument that a 23-year-old may have had a life expectancy of less than three years is less than compelling, and the defendants offer no proof whatsoever in support of this argument. It is apparent that the trial judge erred in finding that Gatlin had

established no right to recover for loss of society and companionship, and the present case must accordingly be reversed as to damages in addition to liability.

### (2) Funeral Expenses

¶32. The trial judge refused to allow Gatlin to introduce evidence of funeral expenses based on the fact that she could not establish that she had paid these expenses personally. However, this Court has never held that such a showing is a pre-requisite for recovering funeral expenses in a wrongful death case. Mississippi has adopted and follows the "collateral source rule." Under this rule of law, a defendant tortfeasor is not entitled to have damages for which he is liable reduced by reason of the fact that the plaintiff has received compensation for his injury by and through a totally independent source, separate and apart from the defendant tortfeasor. *Central Bank v. Butler*, 517 So.2d 507, 511-12 (Miss. 1987). The record indicates that at least part of Williams' funeral expenses were paid by a victim's rights fund, and this fund clearly constitutes an "independent source, separate and apart from the defendant tortfeasor." As such, the collateral source rule is clearly applicable, and Gatlin was entitled to recover for funeral expenses in the present case.

¶33. The trial judge found in her ruling, and Methodist argues on appeal, that the wrongful death statute overrules the collateral source rule by expressly providing that funeral expenses are subject to the debts of the estate. See: Miss. Code Ann. § 11-7-13. This argument is without merit. The aforementioned provision in § 11-7-13 is entirely unrelated to the collateral source rule, and there is no indication that the Legislature intended to limit the collateral source rule's application in wrongful death cases. By requiring that funeral expenses be subject to the debts of the estate, this provision in § 11-7-13 helps to insure that these funeral expenses are paid from any recovery, but the provision in no way serves to overrule the collateral source rule. The trial judge erred in refusing to permit Gatlin to introduce evidence of her funeral expenses at trial.[6]

¶34. For the foregoing reasons, the ruling of the trial court is reversed,and this case is remanded for a new trial.

¶35. **REVERSED AND REMANDED.**

**PITTMAN AND BANKS, P.JJ., SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J.**

**McRAE, JUSTICE, SPECIALLY CONCURRING:**

¶36. I agree with the majority that the trial court erred by granting directed verdicts to Methodist Medical Center and Dr. David Carlson and that this case should be reversed. I also concur with the majority in its holding of *Hardy v. Brantley*, 471 So. 2d 358, 371 (Miss. 1985). Even though the majority finally says basically that it should also be looked at from the patient's point of view, I would be more explicit with the rationale of *Hardy* by applying it to the relationship between the hospital and the patient, not merely the relationship between the hospital and the physician and/or personnel.

¶37. In *Hardy*, we held that a hospital may be liable, under certain circumstances, for the negligence of an emergency room physician under the doctrine of respondeat superior. If a hospital holds itself out to provide services, such as emergency room services, and there is a contractual arrangement between the hospital and physicians to provide these emergency services, and the patient does not select a specific

physician for the care, then the hospital may be liable for the negligence, if any, on the part of these physicians. *Id.* In *Hardy*, Dr. Terry K. Brantley was one of three physicians of the Hinds Emergency Group (HEG). HEG and Hinds General Hospital had an extensive contract providing that the hospital would have no control over the methods of HEG or its physicians and that members of HEG were not agents of the hospital. *Id.* at 361-63.

¶38. Despite the elaborate provisions of the contract, we found that the hospital was vicariously liable for the negligence of Dr. Brantley. In reaching this conclusion, the Court considered factors such as the hospital held itself out to provide these emergency services; the patient did not choose Dr. Brantley to perform these emergency services but instead relied on the hospital to provide the required care; and the hospital entered into an agreement with physicians to provide this service.

¶39. *Hardy* was distinguished by *Trapp v. Cayson*, 471 So. 2d 375, 384-85 (Miss. 1985), where the relationship between the physician and the hospital was analyzed under the theory of "ostensible agency." Dr. James Trapp was a radiologist who had no contract with the hospital and had a private office outside the hospital. He was a member of the hospital's medical staff, but the only control the hospital had over the radiologists were through audits of their work. The radiologists at the hospital set their own schedule, and the hospital paid them no salary or compensation. *Id.* at 384. We found Dr. Trapp *not* to be an agent of the hospital, and therefore, the hospital was not liable for the doctor's negligence.

¶40. The present case should also be analyzed under the ostensible agency theory, but the Court should focus its attention on the relationship between the patient and the hospital providing the emergency care, not the relationship between the hospital and the physician. The factors considered in the above two cases are irrelevant in this case. The hospital held itself out to provide services for emergency care, which included surgeries and the use of blood being provided to the patient. The nature of the contract between the hospital and the physician or the blood bank personnel is not requested by the patient when they ask for these services. The patient is relying on the hospital to supply these in an emergency room situation, and the hospital should have been held accountable for not insuring the necessary amount of blood was available. Therefore, although a hospital may be held vicariously liable under the theory of respondeat superior in *Hardy*, Methodist Medical Center should also be primarily liable for the negligence of not supplying needed blood to the patient during surgery performed at the hospital.

¶41. For example, the Restatement (Second) Of Torts, § 429 (2000) states:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

¶42. Under the Restatement (Second), whether the physician was employed under a contract with the hospital or was acting as an independent contractor does not matter; the hospital would still be liable because it offered its services to the general public. Despite the various contractual arrangements made between hospitals and physicians, patients have little reason, concern, nor opportunity to review these contracts, especially in an emergency situation.

¶43. *Hardy* cited to several jurisdictions that have embraced the concept of focusing on the relationship between the hospital and the patient, rather than on the relationship between the hospital and the physician.

*See Hardy*, 471 So. 2d at 369-70 (citing *Beeck v. Tucson Gen. Hosp.*, 18 Ariz. App. 165, 500 P.2d 1153 (Ariz. Ct. App. 1972) (holding a hospital liable for the services of a radiologist because the patient sought the services of the hospital rather than a particular radiologist); *Hannola v. City of Lakewood*, 68 Ohio App. 2d 61, 426 N.E.2d 1187 (Ohio Ct. App. 1980) (finding hospital was liable for physicians and other personnel on duty, despite the nature of their contractual relationship, assuming damages and proximate cause were present)).

¶44. In *Smith v. St. Francis Hosp., Inc.*, 676 P.2d 279, 283 (Okla. Ct. App. 1983), the court held:

> the hospital must be held accountable for the negligence, if any, of its authorized emergency room physician regardless of whether or not he is an independent contractor by secret limitations contained in private contract between the hospital and the doctor or by virtue of some other business relationship unknown to the patient and contrary to the hospital's conduct and representations.

¶45. *Beeck* affirms this rationale and states the following:

> The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of "hospital facilities" expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility. Hospitals should, in short, shoulder the responsibilities borne by everyone else. There is no reason to continue exemption from the universal rule of *respondeat superior*. The test should be, for these institutions, whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its employees and, if he was, was he acting within the scope of his employment.

*Beeck*, 18 Ariz. App. at 169, 500 P.2d at 187 (quoting *Bing v. Thunig*, 2 N.Y.2d 656, 666-67, 163 N.Y.S.2d 3, 10, 143 N.E.2d 3, 8 (1951)).

¶46. These patients are drawn to the hospital for help and assistance, and they rely on the hospital to provide a safe and efficient environment. Whe patients are lying unconscious in surgery or bleeding in an emergency room, their only goal is to get the safest and most efficient care possible. They are not concerned with variations in a physician's or a nurse's contract. In return for their patronage, the hospital should provide the best possible care, whether this be through a physicians' organization, direct hiring, or hiring independent contractors. The hospital is allowing these nurses, physicians, and technicians to provide their expertise on its premises and should be held accountable for the negligence of these persons or otherwise, not allow them on its premises under any circumstances.

¶47. Obviously, Gatlin's son did not stop to review the contract between the physician and Methodist Medical Center before requesting emergency services from the hospital, and there was no reason for him to do so. This patient came to Methodist Medical Center in need of immediate aid and medical attention. Methodist should be liable regardless of whether the patient selected this physician or not. The hospital controls the premises and services, which physicians they allow, as well as which medical and blood

technician persons are employed. The hospital holds itself out to the public as providing emergency care services, and this includes surgeries which often require blood to be supplied the patient. The hospital charges for these services, the facilities, and the blood, and it should be held accountable for these items and services.

¶48. For the above reasons, I concur as to the majority's citing of the *Hardy* holding, but I would be more explicit in the rationale to focus on the relationship between the hospital and the patient, not the hospital and the physician.

### DIAZ, J., JOINS THIS OPINION.

1. As will be seen, Gatlin's second theory is that Methodist should be held liable for the negligence of Dr. Carlson based on this Court's decision in *Hardy v. Brantley*, 471 So.2d 358 (Miss. 1985).

2. The trial judge ruled that Dr. Ferrari was only qualified to give expert testimony as to the standard of care of an anesthesiologist, rather than the standard of care of blood bank personnel. This ruling is not challenged in the present appeal.

3. It is a matter of elementary contract law that, in order to establish a contract, there need only be an offer, acceptance, and consideration. *See, e.g. Putt v. City of Corinth*, 579 So.2d 534, 538 (Miss. 1991). With the exception of cases implicating the statute of frauds, a contract need not be in writing. *Short v. Columbus Rubber & Gasket Co.*, 535 So.2d 61, 64 (Miss.1988); Miss. Code Ann. § 15-3-1 (1995).

4. Methodist supports this argument with deposition, but not trial, testimony from relatives of Gatlin.

5. This Court concludes that any failure to raise this issue at trial should serve as a waiver of a right to object on appeal.

6. It is unnecessary for this Court to consider whether Gatlin's pleadings conformed to this Court's opinion in *Thornton v. Ins. Co. of North America*, 287 So.2d 262, 266-67 (Miss. 1973). Since the issuance of this Court's opinion in *Thornton*, Miss. Code Ann. § 11-7-13 has been amended to provide that wrongful death damages are recoverable even if an estate has not been opened. As such, it was not necessary for Gatlin to phrase her complaint in two separate counts, as required by *Thornton*.