853 So.2d 873 (2003)
Edna KENT, Individually and as Mother and Next Friend of Candice N. Cain, A Minor, Appellant,
v.
BAPTIST MEMORIAL HOSPITALNORTH MISSISSIPPI, INC. and Dr. J. Keith Mansel, Appellees.
No. 2002-CA-00936-COA.
Court of Appeals of Mississippi.
September 2, 2003.
*875 William P. Zdancewicz, David Wayne Camp, for appellant.
R. Bradley Best, Oxford, S. Duke Goza, Jack F. Dunbar, Shelby Kirk Milam, attorneys for appellee.
Before SOUTHWICK, P.J., LEE and GRIFFIS, JJ.
GRIFFIS, J., for the court.
¶ 1. Edna Kent filed a medical malpractice claim on behalf of her daughter, Candice Cain, against Baptist Memorial HospitalNorth Mississippi, Inc. ("Baptist") and Dr. Keith Mansel. The trial court granted Baptist's motion for directed verdict at the close of the plaintiff's case. The jury returned a verdict in favor of Dr. Mansel. Ms. Kent now appeals asserting several assignments of error. Finding no error, we affirm.

*876 FACTS

¶ 2. On September 27, 1993, Candice Cain was sixteen years old. She was at home with her parents when she suffered a severe diabetic seizure and went into septic shock. She was transported by ambulance from her home to the emergency room at Baptist. Upon arrival at Baptist, Candice was in a non-responsive, life threatening state. She was admitted to Baptist's intensive care unit by Dr. Robert Cooper, a partner of Dr. Gerald Hopkins who was Candice's primary care physician. A number of tests were run on Candice, and two other specialists provided medical care to her that night. Dr. Windham performed a lumbar puncture. Dr. Keith Mansel, a board certified critical care pulmonologist, made a respiratory assessment of Candice. Her condition was monitored throughout the night.
¶ 3. The next morning, Dr. Hopkins took over Candice's care from Dr. Cooper. Dr. Hopkins had been Candice's primary care physician since she was two years old. Dr. Hopkins treated Candice for her diabetes. Dr. Hopkins ordered a number of tests including a chest x-ray, pulse MRI of the brain, and an electroencephalogram (EEG) which revealed that Candice was in a state of encephalopathy with no intelligent response to family or any stimuli of any kind. Candice's illness was a mystery.
¶ 4. As the day progressed, Candice began having significant trouble. At approximately 10:00 p.m., Candice's blood pressure dropped substantially. Melissa Smith, the nurse on duty, reported this to Dr. Cooper. Dr. Cooper instructed her to call Dr. Mansel. Dr. Mansel immediately began further treatment of Candice. At approximately 10:30 p.m., Candice began to slip into respiratory distress. At approximately 11:30 p.m., Candice's condition was critical. Dr. Mansel instructed the staff to prepare to intubate Candice, for respiratory support. Dr. Mansel then intubated Candice with a size 8.0 endotracheal tube, with the use of a bronchoscope, and connected her to a mechanical ventilator. Dr. Mansel's notes reflect that the endotracheal tube was placed "without difficulty," which he testified meant that the tube was placed easily without any force applied using only one attempt to place the tube.
¶ 5. Thereafter, Dr. Mansel was concerned that Candice required a higher level of care than he and the other physicians at Baptist could provide. Dr. Mansel then made arrangements for Candice to be transported via helicopter to the pediatric unit at Vanderbilt University Hospital in Nashville, Tennessee.
¶ 6. When Candice arrived at Vanderbilt, the admitting physician noticed swelling, distortion of organs and dried blood in Candice's airway. He chose not to remove the endotracheal tube. Once her condition stabilized, several days later, the physicians at Vanderbilt removed the endotracheal tube to determine if Candice could breath on her own. Unable to breath without aid, the Vanderbilt doctors intubated her again with a 6.5 millimeter tube. Five days later that tube was removed, and she was then intubated with a 6.0 millimeter tube.
¶ 7. After the endotracheal tube was finally removed, the Vanderbilt doctors determined that Candice's vocal cords were damaged. Candice underwent several surgeries to correct the injury, including laser surgeries to separate the fused vocal cords and reconstructive surgery of the vocal cords using harvested costicartilage from Candice's ribs.
¶ 8. On September 26, 1995, Candice's mother, Edna Kent, filed a lawsuit on behalf of Candice alleging that Baptist and Dr. Mansel were negligent in the care of Candice. The claim alleged that the intubation *877 tube Dr. Mansel used was too large for Candice's height and weight and that the large tube used by Dr. Mansel proximately caused Candice's injuries. At trial, the plaintiff presented three of the Vanderbilt doctors as expert witnesses. Dr. Joseph Tobias, Dr. Malcolm Packer, and Dr. Jay A. Werkhaven testified that, in their opinion, Dr. Mansel deviated from the appropriate standard of care in the intubation of Candice by using a size 8.0 endotracheal tube. Dr. Mansel testified on his own behalf and offered his expert opinion that he did not deviate from the standard of care.
¶ 9. Dr. Joseph Tobias, a board certified physician in pediatrics, anesthesiology, critical care medicine and pain management, was Candice's admitting physician at Vanderbilt. Dr. Tobias testified that he had an immediate concern about the size of the endotracheal tube and that he also observed swelling, distortion and blood in Candice's airway. Dr. Tobias opined that the damage to Candice's vocal cords resulted from the insertion of an endotracheal tube that was too large, and the trauma occurred when the tube was placed into Candice's throat. Dr. Tobias testified that a doctor should base the size of the endotracheal tube on the patient's age, with consideration given to the actual size of the patient. He testified that the smaller the patient then the smaller the tube should be. Dr. Tobias testified that for Candice's age, height and weight, the proper size endotracheal tube was between 6.0 to 7.0 millimeters.
¶ 10. Dr. Malcolm Packer, a board certified physician in anesthesia, pediatrics and pediatric critical care, also cared for Candice during her stay at Vanderbilt. Dr. Packer testified that Candice suffered severe scarring of the airway due to the placement of an endotracheal tube which was too large. Dr. Packer testified the standard of care for Candice, considering her age and size, required the use of a 6.5 to 7.0 millimeter size tube. He further testified that the use of an 8.0 millimeter tube was a deviation from the standard of care.
¶ 11. Dr. Jay A. Werkhaven, a board certified otolaryngologist[1], treated Candice after she was released from Vanderbilt. Dr. Werkhaven performed the surgeries on Candice's vocal cords. Dr. Werkhaven testified that he observed raw cartilage exposed in Candice's throat. In his opinion, Dr. Werkhaven testified that the damage was caused by the 8.0 millimeter tube placed by Dr. Mansel. Dr. Werkhaven testified the vocal cords were raw and that scar tissue was forming which caused the vocal cords to fuse together. Dr. Werkhaven testified that the standard of care in the intubation of a patient was to evaluate their size, and not determine tube size solely based on age.
¶ 12. Each of the plaintiff's expert physicians admitted that they had no training as a pulmonologist or a critical care pulmonologist, the medical specialties of Dr. Mansel. Each also admitted they had formed their opinions without reviewing Candice's medical records at Baptist.
¶ 13. At the close of the plaintiff's case, Baptist moved for a directed verdict. Baptist argued that the plaintiff had failed to prove that Baptist was vicariously liable for Dr. Mansel's alleged medical negligence. The circuit court granted Baptist's motion and dismissed Baptist. Dr. Mansel also moved for a directed verdict, but it was denied.
¶ 14. Dr. Mansel proceeded to present his evidence. Dr. Mansel testified that he *878 is a board certified physician in pulmonology, critical care pulmonology, and internal medicine. He was educated at the University of Mississippi Medical Center, and he served a residency in internal medicine at the Mayo Clinic, where he graduated first in his class.
¶ 15. Dr. Mansel testified that the standard of care for critical care pulmonologist in emergency situations is to select the largest endotracheal tube that can be placed in a patient's airway "without difficulty." He explained that this is the golden rule because when a patient is in respiratory distress, the patient needs the most oxygen possible without damaging the airway. Dr. Mansel further testified that his decision to select the 8.0 millimeter tube was consistent with his training at the Mayo Clinic. To demonstrate this, an excerpt from a recognized authoritative treatise, Intensive Care Medicine, was presented to the jury. A table in that text recommended tube sizes depending upon the age of the patient. Patients age fourteen and up had a recommendation of a size 8.0 to 9.0 millimeter tube. Dr. Mansel also testified that he intubated Candice with the 8.0 millimeter tube without any resistance and on the first attempt. Dr. Mansel testified that if he had encountered any difficulty, he would have immediately removed the tube and utilized the next smaller size tube. Dr. Mansel further attributed her swollen throat and injury to her diabetic condition.
¶ 16. Nurse Melissa Smith assisted Dr. Mansel with Candice's intubation. She testified she witnessed the intubation of Candice and recorded in the medical records that Dr. Mansel had inserted the tube "without difficulty." Nurse Smith testified that "without difficulty" meant that "the tube was placed easily without any force applied."
¶ 17. At the conclusion of the trial, the jury retired to deliberate. After five minutes the jury informed the court that it had reached a decision and rendered its verdict in favor of Dr. Mansel. The name "defendant" on the verdict form was underscored four times. The plaintiff moved for a judgment notwithstanding the verdict or in the alternative a new trial, which the lower court denied.

ANALYSIS
I. Whether the trial court erred in directing a verdict on behalf of the defendant Baptist Memorial HospitalNorth Mississippi, Inc.
¶ 18. On appeal, we conduct a de novo standard of review of motions for directed verdict. Sperry-New Holland v. Prestage, 617 So.2d 248, 252 (Miss.1993). When deciding whether the granting of a motion for directed verdict was proper by the lower court, this Court considers the evidence in the light most favorable to the non-moving party and gives that party the benefit of all favorable inferences that may be reasonably drawn from the evidence presented at trial. Id. If the favorable inferences have been reasonably drawn in favor of the non-moving party so as to create a question of fact from which reasonable minds could differ, then the motion for directed verdict should not be granted and the matter should be given to the jury. Id.; Pace v. Financial Sec. Life of Mississippi, 608 So.2d 1135, 1138 (Miss. 1992); Vines v. Windham, 606 So.2d 128, 131 (Miss.1992).
¶ 19. Here the plaintiff claims that Baptist can be liable for the alleged negligence of Dr. Mansel under the theory of vicarious liability. Kent cites Hardy v. Brantley, 471 So.2d 358 (Miss.1985) and Gatlin v. Methodist Medical Center, Inc., 772 So.2d 1023 (Miss.2000).
*879 ¶ 20. In Hardy, the patient was taken to the emergency room at Hinds General Hospital with severe stomach pains. Hardy, 471 So.2d at 360. The patient was treated by the emergency services physician, who concluded that the patient was suffering from heat exhaustion and sent him home after treatment with medications. Id. The patient died the next afternoon. The cause of death was a perforated duodenal ulcer, not heat exhaustion. Id. at 361. Considering the hospital's vicarious liability, the supreme court held:
Where a hospital holds itself out to the public as providing a given service, in this instance, emergency services, and where the hospital enters into a contractual arrangement with one or more physicians to direct and provide the service, and where the patient engages the services of the hospital without regard to the identity of a particular physician and where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment, the doctrine of respondeat superior applies and the hospital is vicariously liable for damages proximately resulting from the neglect, if any, of such physicians. By way of contrast and distinction, where a patient engages the services of a particular physician who then admits the patient to a hospital where the physician is on staff, the hospital is not vicariously liable for the neglect or defaults of the physician.

Id. at 371.
¶ 21. In Gatlin, the patient was taken to the emergency room at Methodist Medical Center ("Methodist") after being shot. Gatlin, 772 So.2d at 1025 (¶ 1). Several doctors began surgery to repair the patient's injuries. Id. at 1025(¶ 2). Dr. David Carlson was the anesthesiologist on call and assisted with the surgery. Id. The patient subsequently died. His parents filed suit against Dr. Carlson and Methodist. However, the trial judge directed a verdict in favor of Methodist. Id. at 1025-26 (¶ 5). The supreme court reversed, holding that a reasonable trier of fact could have found Methodist liable under Hardy in that the extensive nature of Dr. Carlson's practice at Methodist could support a finding of vicarious liability, that Methodist held itself out to the public as providing emergency services, and that the patient obtained Methodist's services without regard to or even knowledge of the identity of any particular physician at the hospital. Gatlin, 772 So.2d at 1030(¶ 22).
¶ 22. In this appeal, the plaintiff asserts that this case is analogous to Hardy and Gatlin, and it was error for the judge to direct a verdict for Baptist. Ms. Kent argues that Dr. Mansel was one of two pulmonologists who practiced at Baptist, he leased his office space from the hospital, he was a medical director of three units, and he derived all his income through his practice there. Ms. Kent argues that this is the "very extensive nature of practice and relationship" that supports a finding that Baptist should be held vicariously liable for the negligence of Dr. Mansel according to Gatlin.
¶ 23. The reasoning of Hardy and Gatlin focuses on the patient's motivation for utilizing the hospital's services. Both of these cases consider whether the patient came to the hospital for treatment from a particular physician or whether they sought services from a physician who happened to be on staff at the particular hospital. Gatlin, 772 So.2d at 1028(¶ 15); Hardy, 471 So.2d at 371. In both of these cases, the patient indiscriminately sought the care of any physician on duty at the hospital's emergency room.
¶ 24. Hardy and Gatlin are distinguishable from the present appeal. Candice *880 initially sought treatment from Baptist's emergency room and the physician assigned. However, she was admitted to Baptist under the care of Dr. Cooper, a partner of her primary care physician. Within several hours, well before the alleged act of malpractice, Candice's care was under the supervision and control of her long time primary care physician, Dr. Hopkins. It was her physicians, Dr. Cooper and Dr. Hopkins who sought consultation from Dr. Mansel. Therefore, Dr. Mansel did not provide medical care to Candice simply as the physician assigned by Baptist, but was instead providing treatment at the request of Dr. Hopkins or his partner. We find that Trapp v. Cayson, 471 So.2d 375 (Miss.1985), is controlling authority here.
¶ 25. In Trapp, John Cayson was hospitalized at North Mississippi Medical Center where he underwent tests at the direction of his primary care physician, Dr. William Gary. Id. at 376. Dr. Gary ordered an arteriogram from Dr. James T. Trapp at Radiology of Tupelo. Id. During the arteriogram, Cayson had an adverse reaction and eventually was paralyzed. Id. at 377. Cayson filed suit against Dr. Trapp and North Mississippi Medical Center. The trial court directed a verdict in favor of the North Mississippi Medical Center. Id. The supreme court affirmed, finding that unlike Hardy, the hospital did not select the radiologist for the patient; instead, the physician who ordered the test requested a specific radiologist. Id. at 384.
¶ 26. After our review, we find that Candice was treated by Dr. Mansel as a result of the direct request or selection by Candice's primary care physician, Dr. Hopkins or his partner, and not Baptist. Therefore, we find no error in the trial court's decision to direct a verdict in favor of Baptist.
II. Whether the trial court erred in refusing to allow plaintiff to testify concerning her medical bills pursuant to Miss.Code Ann. § 41-9-119 thereby limiting the amount of damages the plaintiff was allowed to present to the jury.
¶ 27. Statutory interpretation is a question of law, and we review questions of law de novo. Donald v. Amoco Prod. Co., 735 So.2d 161, 165(¶ 7) (Miss.1999). This standard of review requires that we examine all evidence in the record in a light most favorable to the non-moving party. Moore ex rel. Benton County v. Renick, 626 So.2d 148, 151 (Miss.1993).
¶ 28. Mississippi Code Annotated § 41-9-119 (Rev.2001) provides that "proof that medical, hospital, and doctor bills were paid or incurred because of any illness, disease, or injury shall be prima facie evidence that such bills so paid or incurred were necessary and reasonable." This presumption is rebuttable; however, to do so, more than speculation and credibility attacks must be offered. Boggs v. Hawks, 772 So.2d 1082, 1087(¶ 19) (Miss. Ct.App.2000). The defendant can rebut such damages by putting forward proper evidence tending to negate the necessity and reasonableness of the expenses. Jackson v. Brumfield, 458 So.2d 736, 737 (Miss.1984). See also Moody v. RPM Pizza, Inc., 659 So.2d 877, 886 (Miss.1995).
¶ 29. In her next assignment of error, Ms. Kent argues that the trial court erred in precluding her from presenting to the jury all the medical bills incurred by her daughter at Vanderbilt. Ms. Kent contends that Dr. Mansel failed to rebut the necessity and reasonableness of the medical bills she offered into evidence and, therefore, they should have been admitted into evidence. However, the question here does not pertain to the necessity and reasonableness *881 of Candice's medical expenses; rather, it is whether her injuries and resulting medical expenses were proximately caused by Dr. Mansel's negligence. "[R]ecoverable damages must be reasonably certain in respect to the efficient cause from which they proceed, and ... the burden is on the claimant to show by a preponderance of the evidence that the person charged was the wrongful author of that cause." Blizzard v. Fitzsimmons, 193 Miss. 484, 487, 10 So.2d 343, 345 (1942). See also Brake v. Speed, 605 So.2d 28, 32 (Miss.1992) (finding a defendant cannot be held liable for the whole of a series of consecutive, and not concurrent, happenings when he is liable if at all, only for a part); Jackson v. Swinney, 244 Miss. 117, 124, 140 So.2d 555, 557 (1962) (rejecting conjecture as a basis for liability).
¶ 30. In this case, Candice was diabetic, and she came to Baptist as a result of complications from her diabetes. Every doctor who was a witness at this trial testified that because of Candice's diabetic seizure and resulting coma, hospitalization was the only option for her care. The record indicates that Candice received treatment for a variety of other medical conditions at Vanderbilt unrelated to the alleged negligent intubation, including (1) diabetic renal failure, (2) diagnosis and treatment of a subsequent diabetic seizure at Vanderbilt, and (3) other treatment and management of her diabetic condition and related medical complications. The evidence shows that Candice would have incurred medical bills regardless of the injury to her throat. Dr. Mansel did not cause Candice's diabetes, her seizure or the complications that resulted therefrom. Accordingly, Candice's only recoverable damages were those which resulted because of or due to Dr. Mansel's alleged negligence. Any medical expenses relating to her other treatment were inadmissable and non-recoverable.
¶ 31. At trial, the parties stipulated that Candice incurred $34,288 in medical expenses for the medical treatment to her airway. There was substantial evidence presented to the jury as to the actual medical expenses incurred by Candice relating to her claim against Dr. Mansel. The exclusion of any amount above this figure was not an abuse of discretion by the court. Moreover, since the jury returned a verdict in favor of Dr. Mansel, any error relating to the admission of evidence solely as it relates to damages is moot. If any such error existed it was harmless, as it did not affect the outcome of the jury's verdict. Therefore we find no merit in this assignment of error.
III. Whether jury instruction D2-2 was not a correct statement of the law in Mississippi.
¶ 32. This issue was never presented to the trial court by way of objection to the jury instructions, or otherwise. This error was not asserted in Ms. Kent's motion for judgment notwithstanding the verdict. Accordingly, Ms. Kent is barred from presenting this issue for the first time on appeal. Triplett v. City of Vicksburg, 758 So.2d 399, 401(¶ 9) (Miss.2000).
IV. Whether the verdict was supported by bias and prejudice rather than careful thought and deliberation?
¶ 33. Where an appellant challenges a jury verdict as being the product of bias, prejudice or improper passion, the supreme court has held that it will show great deference to the jury verdict by resolving all conflicts in the evidence and every permissible inference from the evidence in the appellee's favor. Wal-Mart Stores, Inc. v. Johnson, 807 So.2d 382, 389 (¶ 16) (Miss.2001). Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand *882 would sanction an unconscionable injustice, will the supreme court disturb it on appeal. Id.
¶ 34. Ms. Kent asserts that the verdict was not properly deliberated and it was the product of bias and prejudice because the jury deliberated for only five minutes and underlined defendant four times on the verdict form. This issue was never presented to the trial court by way of objection or in the post trial motion. Accordingly, Ms. Kent is barred from presenting this issue for the first time on appeal. Triplett, 758 So.2d at 401 (¶ 9).
¶ 35. Nevertheless, we will briefly discuss the merits of this argument. First, as to the length of the jury's deliberation, "our case law is well settled that short deliberations do not automatically evidence bias or prejudice." EkornesDuncan v. Rankin Med. Ctr., 808 So.2d 955, 962(¶ 29) (Miss.2002). There is no formula to determine how long a jury should deliberate. In Johnson v. State, 252 So.2d 221, 224 (Miss.1971), cert. denied, 405 U.S. 991, 92 S.Ct. 1262, 31 L.Ed.2d 459 (1972), the Mississippi Supreme Court held:
Because the jury's time of considering their verdict did not exceed seven minutes, it does not follow that the jurors did not carefully consider the testimony and the exhibits. It is not only possible but probable that when the state and the defendant had rested and the summations had been made each juror had decided in his mind the issue of innocence or guilt. After the brief deliberation with each other, the jurors found that they were of a single mind as to the guilt or innocence of the appellant and found him to be guilty.
Under the facts of this case this Court is unwilling to lend its authority to the establishment of any formula or guideline relating to the time a jury must deliberate before delivering its verdict. This Court is cognizant of the fact that in the past in occasional cases, as in the case at bar, rather brief deliberations have taken place in the jury room and verdicts have been returned with unusual rapidity. There is no yardstick of time which a jury should use before reaching a verdict. No two cases are similar as to facts and therefore the law varies in its application thereto. Therefore, we cannot hold that in the time utilized by the jury it could not reach a proper verdict of guilty.

(emphasis added).
¶ 36. In Smith v. State, 569 So.2d 1203, 1205 (Miss.1990), the supreme court relied on Johnson and upheld a verdict where the jury only deliberated for three minutes. Likewise, we decline to establish a time frame or a yardstick for a jury to deliberate. As discussed in Johnson, it is an equally plausible argument that the small amount of time it took to deliberate evidenced the jury's confidence and certainty in its decision.
¶ 37. Next, Ms. Kent argues that the underlining of the word "defendant" evidences the jury's bias, prejudice or improper passion. We find this claim too speculative. Based on the record before us, we have no way to know who underlined the word or their reasoning for doing so. Additionally, Ms. Kent points to no particular incident in the record which would have caused bias or prejudice on the part of the jury. Combined with the speed of the jury's deliberation, it may be said that the underscoring of "the defendant" indicated confidence and certainty in their decision. We find this issue is without merit.
V. Whether the jury verdict was contrary to the evidence or unsupported by the evidence.
*883 ¶ 38. "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." Herrington v. Spell, 692 So.2d 93, 103 (Miss.1997). The jury is the ultimate judge of the weight of the evidence and the credibility of the witnesses. Jackson v. Griffin, 390 So.2d 287, 289 (Miss.1980). "Because of the jury verdict in favor of the appellee, this Court will resolve all evidentiary conflicts in the appellee's favor and will draw all reasonable inferences which flow from the testimony given in favor of the appellee." Southwest Miss. Reg'l Med. Ctr. v. Lawrence, 684 So.2d 1257, 1267 (Miss.1996) (quoting Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Assoc., 560 So.2d 129, 131 (Miss.1989)). We will not set aside the jury's verdict unless the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Herrington, 692 So.2d at 104.
¶ 39. Ms. Kent argues that it is incumbent upon the defendant to offer an independent expert to counter the testimony of the plaintiff's experts. In her brief, Ms. Kent asserts that the failure of Dr. Mansel to refute the testimony of her expert witnesses warrants a reversal of the jury's verdict as being against the overwhelming weight of the evidence. Ms. Kent contends that, under Mississippi law, once the plaintiff has presented expert testimony then the burden shifts to the defendant to present expert testimony or risk a directed verdict.
¶ 40. The Mississippi Supreme Court recently evaluated and rejected the same argument in McCaffrey v. Puckett, 784 So.2d 197 (Miss.2000). The court held that:
Mississippi case law demands that in a medical malpractice action, negligence cannot be established without medical testimony that the Defendant failed to use ordinary skill and care. Sheffield v. Goodwin, 740 So.2d 854 (Miss.1995). There is no such case requiring that the defendant offer expert testimony or risk a directed verdict. We decline to adopt such a rule.
McCaffrey, 784 So.2d at 206(¶ 33).
¶ 41. Furthermore, even if this were the law, Ms. Kent fails to consider the testimony of Dr. Mansel. Dr. Mansel was offered as an expert in the field of pulmonology and critical care pulmonology. The record indicates that Dr. Mansel was indeed qualified to testify as to the proper standard of care for the intubation of a patient in respiratory distress. The jury was free to weigh the testimony of Ms. Kent's expert witnesses and that of Dr. Mansel to determine who they believed.
¶ 42. Also, Dr. Mansel presented substantial evidence to refute the credibility of Ms. Kent's expert witnesses. Each of the three Vanderbilt physicians admitted they had not reviewed Candice's medical records from Baptist and none of them were either pulmonologists or critical care pulmonologists. While Ms. Kent's experts testified as to their opinion of the appropriate standard of care, Dr. Mansel also testified as to what he believed to be the standard of care for critical care pulmonologists in emergency situations. Hence the jury had a classic battle of experts before them.
¶ 43. In essence, Ms. Kent's experts testified as to the standard of care regarding treatment of the complications Candice suffered from diabetes. Ms. Kent's experts practiced in pediatrics and otolaryngology, not pulmonology. Dr. Mansel testified as to the standard of care for her *884 respiratory distress, which involved the medical discipline of critical care pulmonology in emergency situations. Ms. Kent's experts were concerned with the treatment of Candice's diabetes and the condition of her throat, while Dr. Mansel was concerned with the condition and continued functioning of Candice's lungs. There was sufficient evidence for the jury to conclude that the appropriate standard of care was for Dr. Mansel to select the largest tube that can be placed in a patient's airway without difficulty. Both Dr. Mansel and his nurse testified that he intubated Candice with the 8.0 millimeter tube without difficulty and on the first try.
¶ 44. Additionally, Candice was intubated twice more at Vanderbilt. A reasonable jury could infer that these intubations caused or significantly contributed to Candice's throat injuries, instead of the first intubation by Dr. Mansel. Contrary to Kent's position that Dr. Mansel presented no testimony to dispute her experts, there was sufficient evidence to support the jury's verdict. Therefore, we do not find that the jury verdict is so contrary to the overwhelming weight of the evidence as to warrant a reversal.
¶ 45. THE JUDGMENT OF THE CIRCUIT COURT OF LAFAYETTE COUNTY IS AFFIRMED. COSTS ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS AND CHANDLER, JJ., CONCUR.
NOTES
[1] An "otolaryngologist" is a physician who specializes in the diseases of the ear, larynx and throat, including the upper respiratory tract.